# Exhibit A

*Contains sensitive Data*

**2019   87639**

*P40*

Cause No. 2019-_____

| | | |
|---|---|---|
| **Another Jane Doe, Plaintiff** | § | **In the District Court** |
| **Versus** | § | |
| **Community Health Choice TX** | § | **270th Judicial District** |
| **Inc., Navitus Health Solutions,** | § | |
| **LLC, and Clint Doe, Defendants** | § | **Harris County Texas** |

**FILED**
Marilyn Burgess
District Clerk
DEC 11 2019
Harris County, Texas
Time: _____
By _____ Deputy

Iris Collins

### Original Petition of Plaintiff, Another Jane Doe

**TO THE HONORABLE JUDGE OF THIS COURT:**

Another Jane Doe ("Plaintiff) files this Original Petition alleging Defendants Community

Health Choice TX Inc. ("CHC"), Navitus Health Solutions ("Navitus"), and Defendant Clint

Doe ("Defendants") defamed Plaintiff, illegally released her confidential communications,

maliciously caused a wrongful civil commitment, and has inflicted extreme emotional

distress upon her. Plaintiff was subjected to a notoriously dysfunctional system where she

was maliciously injured, receiving Harris County's infamous brand of Jane Doe Justice.

Plaintiff discovered that the policy of state, county, and municipal agencies is to deny

appropriate medical care to disabled non-criminal mental health detainees putting their

lives at risk. Whatever the reason may be, the contempt and disdain for the mentally ill is

apparent. The coordinated destruction and falsification of governmental records hides this

malfeasance. Plaintiff reluctantly uncovered this shocking situation when she was injured

by treatment that meets the definition of torture under the Geneva Convention.

In support hereof, Plaintiff would respectfully show the following:

1

**RECORDER'S MEMORANDUM**
This Instrument is of poor quality
at the time of Imaging

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 1 of 40

# I
## Parties

1.1     At the time of the defamation Pro Se Plaintiff, Another Jane Doe, resided in Harris County at her own home at 5927 Benning Drive, Houston, Texas 77096. She purchased a health care plan from CHC in 2017 and 2018. She has a BS from Rice University and a JD and a post-divorce LLM from the University of Houston. She was an attorney at a prestigious internal law firm prior to becoming a stay at home parent. She divorced fifteen years ago.. At the time of the defamation she lived alone in a well maintained paid-for home. She supports herself, pays all of her bills on time, has excellent credit, and despite working only temporary jobs, has been continuously employed for six years.  Health challenges occasionally prevent her from working and she leaves stressful positions to protect her health.

1.2     Defendant, Community Health Choice TX Inc., is a Texas Managed Care Organization affiliated with the Harris Health System. CHC offers Health Insurance Plans through the Health Insurance Marketplace. Plaintiff requests the clerk of the court serve CHC with citation by Registered Mail at its principal place of business located at 2636 South Loop West, Suite 125 Houston. At all times herein discussed Clint Doe acted as the agent of CHC, Clint Doe acted with actual authority, and CHC has ratified his acts.

1.3.    Defendant, Navitus Health Solutions, LLC, is a Wisconsin Limited Liability Company and is associated with CHC as its Pharmacy Benefit Manager providing pharmacy benefit services to those insured by CHC. Navitus is a subsidiary of Dean Health System which is in turn a subsidiary of SSM Health Care Corporation, an eight-billion-dollar company headquartered in St. Louis, Missouri. Navitus's principal place of business is located at

2

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 2 of 40

1025 West Navitus Drive, Appleton, WI 54913. Plaintiff requests the clerk of the court serve Navitus with citation by Registered Mail by service upon its designated agent for Service of Process, System CT Corporation, located at 1999 Bryan Street, Ste. 900, Dallas TX, 75201. At all times Clint Doe acted as the agent of Navitus and Navitus has ratified his acts. Navitus is liable as an agent of CHC and as the employer of Clint Doe who was acting with actual authority. CHC has ratified all of the acts of Navitus' acts.

1.4     Upon information and belief Defendant Clint Doe, whose name has never been disclosed to Plaintiff, is a pharmacist whose primary employer may be Navitus. CHC and Navitus have refused to reveal Defendant Clint Doe's identity.[1] Plaintiff will serve Defendant Clint Doe after receiving Defendants CHC and Navitus' Responses to Plaintiff's Rule 194 Requests for Disclosure or seek substituted service from the court. Clint Doe has purposefully and maliciously acted and has personal liability for his tortious conduct.

## II
## Venue and Jurisdiction

2.1     Venue is proper in Harris County because that is where Plaintiff lived when the defamation giving rise to this claim occurred.[2]

---

[1] Plaintiff Jane Doe filed a complaint with the Texas Department of Insurance ("TDI") on September 6, 2019, requesting information concerning Clint Does identity for the purposes of filing a complaint with his licensing agency and service upon him in this suit. TDI has yet to respond to her request. When she has called the TDI to inquire as to the status of her complaint they informed her that they are too busy to respond to her, but will, when they have time. In the past TDI has stated to Plaintiff that insurance companies cannot commit criminal fraud because the laws regarding criminal fraud do not apply to insurance companies. Maybe TDI believes that defamation laws do not either. Plaintiff entertains reasonable doubts concerning TDI's willingness to support the theoretical rights of Plaintiff and other injured consumers.
[2] Tex. Civ. Prac. & Rem. Code Section 15.017.

3

PRIVATE INFORMATION CONTAINED

2.2     This court has jurisdiction because the relief sought is within the court's jurisdictional limits and the parties are all either residents of Texas, or transact business in Texas, or have committed torts in Texas.[3]

2.3     The damages sought in this suit are within the jurisdictional limits of this court. Under Rule 47 Plaintiff discloses that she may seek monetary relief of over $1,000,000 as well as judgment for all other relief to which Plaintiff and others, similarly situated, may be justly entitled.

## III
## Statute of Limitations and
## the Notification of Detention

3.1     The defamation was uttered on December 10, 2018, but as a result of this defamation, Plaintiff was involuntarily detained and not released until December 11, 2018. In a claim based upon duress, where a person is compelled to act contrary to their free will, the Statute of Limitations is tolled until the duress is lifted.[4] The Involuntary Detention lasted until December 11th, therefore if the Limitations Period were not suspended, the 12th would be the final day to file. But the failure to give Plaintiff the Notification of Detention suspends the Statute.

3.2     In a warrantless involuntary mental health detention the detaining Officer must file a Notification of Detention at the facility. It is a chain of custody document that provides the basis of the facilities' jurisdiction and the authority to conduct a medical examination in a law enforcement investigation. This document must contain "the name and relationship to the apprehended person of any person who reported or observed the

---

[3] Tex. Civ. Prac. & Rem. Code Section 17.042(2).
[4] *Doe v. Catholic Diocese of El Paso*, 362 S.W.3d 707, (Tex.App.-El Paso 2011).

4

PRIVATE INFORMATION CONTAINED

behavior, acts, attempts, or threats [*i.e.,* Clint Doe]."[5] Plaintiff was detained in two different

facilities and has requested her medical records from both.  "The facility where the person

is detained shall include in the detained person's clinical file the notification of detention

described by this section."[6] Neither facility has included the Notification of Detention in

the records returned. "The denial of a patient's access to any portion of a record by the

professional or other entity that has possession or control of the record suspends, until

the release of that portion of the record, the running of an applicable statute of limitations

on a cause of action in which evidence relevant to the cause of action is in that portion of

the record."[7]

3.3      Thus the statute of limitations has been tolled ever since the Neuro Psychiatric

Center told Plaintiff that they had no records of her assessment because they do not

maintain records of people not admitted. Plaintiff was repeatedly told that no medical

records were ever maintained for any involuntary detainee was assessed but rejected for

medical reasons. Upon information and belief Disability Rights Texas requested the

Plaintiff's medical records and were initially informed there were no records and then was

informed medical records were allegedly discovered. These "found" records are

incomplete and do not contain the Notification of Detention.

## IV
## Discovery Control Plan

4.1      Plaintiff identifies Discovery Level 3 under Rule 190. Plaintiff has received a DOJ

Right to Sue Letter regarding the deprivations of her Civil Rights. Ongoing investigations

---

[5] Health and Safety Code Section 573.002(b)(7).
[6] Health and Safety Code Section 573.002(c).
[7] Health and Safety Code Section 611.0045(k).

5

PRIVATE INFORMATION CONTAINED

are creating an independent record. Administrative actions may be brought regarding the policies Plaintiff uncovered. Those matters and discovery pursued in this action will be relevant as to the propriety of adding appropriate parties. Discovery from these third parties is warranted to establish Defendants' liability and Plaintiff's damages.

4.2      Plaintiff has 42 USC Section 1983 claims against Defendants and other potential parties that involve the same personal injury damages. She is not yet including these claims in this suit. The civil rights claims concern the coordinated denial of medically appropriate care to disabled non-criminal detainees by multiple governmental actors. The actors coordinate the selective destruction and falsification of detainees' records. Detainees who are immediately released are given illegal bills and their private information protected by Section 611 of the Health and Safety Code is illegally forwarded to their insurance company. If Plaintiff's analysis is correct, the wrongful policies violating civil rights are followed by most, if not all, local law enforcement agencies. Likewise, the different facilities coordinating treatment within the public health sector are unlikely to have major policy differences in a specific regulated area. If any agencies or facilities in the coordinated public health system do follow·the law, that would be compelling evidence of scienter.

# V
## Factual Background

**Plaintiff's history of Depression that was partially triggered by being victimized by violence, police abuse, and insurance company malfeasance.**

5.1      Ten years ago, after Hurricane Ike, an insurance company engaged in outrageous fraudulent behavior denying Plaintiff covered benefits with disastrous consequences. The first insurance adjuster (FIA) in that debacle was also combative and hostile; FIA accused

6

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 6 of 40

Plaintiff of being a criminal for fraudulently requesting uncovered damages. Unbeknownst to FIA the "fraudulent claims" Plaintiff was advancing were damages that had been identified by an independent engineer contained in a professional inspection report.[8] FIA "promised" Plaintiff that if she continued her "fraudulent demands" the insurance company would make sure that she arrested and put in chains. FIA stated that he looked forward to seeing Plaintiff in chains. FIA's deliberate under adjustment, the company's criminal policy to put the insured's contractor in charge of the completion of a substantial portion of the adjustment, and company's defusal of responsibility among uncoordinated agents[9] exponentially enabled contractor fraud.

5.2     Shortly after the insurance company threatened to have Plaintiff imprisoned, she was sent a letter of denial of her structural damages. Even when she informed the insurance company that she had three expert reports written by engineers that addressed her damages, they stated that until she had a contactor with a written contract, they would not even look at her reports. Reputable contractors told her that the adjustment was so low they were not interested in working for her. By the time Plaintiff realized that the insurance company would not give her a fair adjustment, all the reputable contractors

---

[8] Prior to the insurance company inspecting her damages Plaintiff had a professional inspection to assess her home's hurricane damages. The first insurance adjuster (FIA) visited Plaintiffs home three weeks after the Hurricane and spent substantially less time than the professional inspector. Nor did he take moisture readings throughout the property. A week it became apparent that the insurance company had finished the investigation. Plaintiff was shocked, she went through one of these expert reports almost verbatim. Summer noted in the claim file: "She was rambling and not making a whole lot of sense." FIA in Insurance Company Claim File at page 0067. The Insurance Company later admitted his adjustment was inadequate.

[9] Plaintiff is a document attorney. She has read the expert studies about this technique, now widely used by almost every insurance company and most corporations. It is designed not only to frustrate consumers and wear them down, but to make it so that they never talk to anyone who is fully aware of their issues and can actually offer them help. Most importantly this technique makes it so the people at the call center do not develop a personal interest in the wronged consumer. If they did, the company risks that their workers start to feel guilty or responsible about the wrongs being done to the consumer. It is a malicious technique that should be considered *prima facie* evidence of bad faith.

7

PRIVATE INFORMATION CONTAINED

were booked for the next year. She hired a contractor who was planning to use a large

local roofing company, thinking that if the roof was right, she could live with other

deficiencies. But the contractors and the roofing company were crooks and had intended

to defraud her from the moment they saw her. Women who have a history of being abused

are often targets of criminal.

5.3     Plaintiff lived through a nightmare; her home became a non-functional

construction crime zone for three years. The new roof was so badly done that it collapsed

in April of 2009. She was repeatedly victimized by the abusive and physically threatening

behaviors of multiple contractors and their workers. Before she gained sixty pounds (from

the anti-depressants) numerous men made unpleasant sexual advances towards her; at

least two forcefully man handled her. She was afraid of being raped as she had been

several times before.[10]

---

[10] The first time Plaintiff was sexually assaulted was when she was eighteen years old; she was assaulted by her treating physician. However, this was decades before the "me too" movement and Plaintiff had internalized the message that this only happened to bad girls who deserved it. Around the same time another doctor had tried to rape her, and she was brutally traumatized by the police. In bygone times she was hitch-hiking, and a drunken doctor picked her up. He attacked her. She escaped from the car, but he followed her and tried to drag her back into the car. People saw her being attacked and came to her rescue; the police were called. The doctor told the police she was a whore who had stolen one hundred dollars from him. The police were not nice. They strip searched and bodily cavity searched her all the while making cruel and derogatory comments.  When no money was found they arrested her attacker for the assault. However, she went to the first court hearing, and the assistant district attorney told her that they were dropping the charges because the doctor had apologized – *to them* – and he was a "family man." The prosecutors did not want to ruin the career of a drunken rapist doctor.

     These two incidents happened in another state, but a similar incident happened here. Plaintiff was jogging at dusk in Memorial Park when a man leaped at her, within minutes he beat her so badly she had visible bruises for over half a year. Fortunately, a police officer saw the attack and the man was arrested. Months later, when Plaintiff called to ask what was happening, she was told that he had been given probation. He too was a "family man" and they didn't want to hurt his family. Ironically, many years later the Harris County District Attorney's office called Plaintiff. Her testimony was needed in the punishment phase of his trial. He had been convicted for repeatedly raping his underage daughter; she had two children with him.

     It was decades before she could talk about the trauma of these incidents and she believes that they were major factors in the depression that she suffered. She was not a criminal because she was mentally ill,

8

PRIVATE INFORMATION CONTAINED

5.4     Plaintiff's third contractor turned out to be a dangerous con man who had a reputation for criminal violence. His bizarre behavior and repeated threats of violence (including *inter alia,* suggestions to hire hit men to kill her previous contractors) cumulated in a display of explosive anger. He kicked her new shower wall until it cracked all the while assuring Plaintiff of her good fortune because it was Plaintiff that should be kicked, not the wall. Plaintiff was a "fucking bitch." "Cunts" like her deserved everything that was coming to them. That charming promise and the thousands of dollars in damage he did not concern the police. Instead they repeatedly asked her if she was sleeping with him. They seemed highly skeptical of her bemused denial.

5.5     During this period the police were not available for other violent crimes in progress, as when her ex paid her a visit. When Plaintiff declined his offer to enter; he broke in. When he left, having released her dogs that she was trying to catch, he gunned his car at her so that she had to leap out of the way to avoid being hit. During this incident Plaintiff called 911 three times to request help.  Forty-five minutes after Plaintiff's ex left, the police dispatcher called. She explained that because Plaintiff did not have a restraining order in place her ex's actions were not crimes and it was the police's policy not to take any reports or respond in "civil" matters such as when a man tries to run his ex-wife down. The police dispatcher advised Plaintiff to hire a lawyer to file a motion. When the male judge ordered that Plaintiff's ex could not break into her home and the male judge ordered that Plaintiff's ex could not run her down with his car, then the police would

---

she became mentally ill because of abuse coupled with law enforcement's indifferent to crimes against vulnerable woman and repeatedly allows women to be the victim of criminals. Just like it allows men to chain disabled, elderly, calm, courteous and innocent woman for six hours based upon the spurious words of a stranger who may have a vested financial interest in shutting her up.

9

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 9 of 40

enforce the male judge's Order.[11] The police dispatcher assured Plaintiff that this was the law in Texas despite the promise of Equal Protection under the Fourteenth Amendment.[12]

5.3     Contractors who defrauded Plaintiff often acted in an abusive, hostile and intimidating manner and routinely threatened violence and baseless legal actions. Plaintiff was terrified. A former boyfriend moved in for a while because she was not safe in her home. Twenty-five thousand dollars' worth of personal property had been pilfered but the police repeatedly refused to allow her to file police reports because she hadn't "timely" reported the first fifty or so items stolen from the construction chaos (every tool she had was taken). The Houston Police also told Plaintiff that the District Attorney was so overwhelmed with Hurricane Ike related contractor fraud they were only reviewing contractor fraud cases in two instances: first, if payment was made and no work was done; or second, if the fraud alleged was over one million dollars.[13] As Plaintiff sold what had been a paid-for home, in a rising market at a just less than $200,000.00 loss, Plaintiff was insufficiently defrauded to be of interest to the authorities, including the Texas Department of Insurance.[14]

---

[11] Plaintiff's ex is wealthy and hired a politicly prominent attorney. Without digressing into the outrageous facts of Plaintiff's divorce it did not surprise her that the judge in her divorce was one of judges who was forced to resign in lieu of prosecution when the family law and probate court corruption had become daily front page news. Secret disappearing Court Orders and rulings unrelated to the law or facts happen when there is a disparity of wealth and power.

[12] Plaintiff often reads of the police shooting and killing a driver who guns a car past an officer; the shooting is always considered justifiable. Plaintiff still cannot understand why it is a capital offence to gun a car past a police officer, but only a civil matter when done to a woman.

[13] When Plaintiff contacted the City of Houston about the contractor permitting fraud, they told her to stop bothering them, they were not concerned with permit and contractor fraud. If she persisted, the City would inspect her home and give her extremely large fines because, as the owner, she was the only one legally responsible for the construction problems and contractors failing to pull permits and conform to construction codes. When she had her new roof inspected three months before it collapsed, the City inspector agreed with the roofer that there were only "a few problems" with "a few boards," but she should just let the contractor fix those "little" issues.

[14] Plaintiff sent a detailed and fully documented complaint to the Texas Department of Insurance, but a high-ranking corporate officer sent a fluffily regretful response, making blatantly false representations of material

10

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 10 of 40

5.4    She became depressed.[15] She started anti-depressant medication and gained sixty

pounds in two months. At one point she was so deeply depressed that at one point she

spent a month in bed unable to physically care for herself and while in bed she developed

rashes. When she emerged, she got treatment but the "rash" on her feet never went away,

it was psoriasis.

5.5    **The Heartbreak of Psoriasis**. Plaintiff recovered from her depression, but her

psoriasis developed into an excruciatingly painful life-threatening disease. Psoriasis is a

disease of opportunity; it attacked her feet where she had nerve and bone damage from a

club foot. As the disease progressed a fissure/plaque cycle developed on her feet. Her

fissures would immediately plaque over when her feet remained still. However, whenever

she moved her feet, including only wiggling her toes, all of the fissures begin to rip open.

These fissures would sometimes bleed. For many years she never had fewer than five

fissures on each foot but, when she experienced stress, she would have more than forty

fissures on each foot. She was mobility impaired; at home she would often crawl on her

hands and knees to avoid aggravating her fissures. She spent thousands of dollars and saw

many specialists, but no treatments worked. Her left foot became badly infected and her

---

fact expressing rosy good will and apologizing to the TDI (once again, like the doctor who tried to rape her, she was not the recipient of the "apology"), and promising to work with Plaintiff. Material statements of fact in this response were flatly contradicted by the claim file narrative and insurance company documents Plaintiff had forwarded to the TDI. If TDI reviewed the claim file in their "investigation" they might have noticed the documents (inadvertently disclosed in discovery) which state the cost to replace Plaintiff's heirloom piano "started" at $18,000, Claim File at 1037, yet the Statement of Loss listed cash value of the Piano at $3,179.67, depreciation was $1,594.91 thus resulting in a payment of $1,602.76.  Claim File at 1342. When Plaintiff found this irrefutable proof of a ninety percent underpayment, she contacted the TDI. Because she was in civil litigation, TDI said it had no jurisdiction to investigate any alleged wrongdoing. But, as the position espoused by the TDI to Plaintiff was that as a matter of law insurance companies cannot commit criminal fraud, as the criminal statutes only apply to the insureds.

[15] Plaintiff had an earlier major depression after she had two miscarriages. She had several years of therapy and was able to escape her abusive situation. However, she still was overly sweet and compliant, a typical characteristic of woman who experience long term emotional abuse.

11

PRIVATE INFORMATION CONTAINED

leg, from her toes to her hip, doubled in size. Her legs have never returned to normal as the infection triggered lymphedema, a circulatory disease. Extremely mobility impaired from her feet and psoriatic arthritis, she never lost the weight she gained and was diagnosed with diabetes. She was told that another infection like the one she had could lead to amputation of her foot or leg or even death. She accepted that her disabilities circumscribed her activities and her life expectancy was diminished. However, she achieved moderate success in her career, supported herself, and lived a quiet though busy and purposeful life.

5.6     **The Otezla Miracle.** In the fall of 2018 a new dermatologist, Dr. Charles Doubleday, proscribed Otezla. The effect was miraculous. Within a week every fissure had healed. Within a month Plaintiff realized the depth of her arthritic pain as she experienced its diminishment. A woman from Dr Doubleday's office called and told her that the CHC needed her medical records and asked her to gather them. She did not tell Plaintiff that was because CHC had denied Otezla. The associate said her email was down, but she would call back with a working email. She never did call back but over the next two weeks Plaintiff called several times and left her messages. On Monday, December 10, 2018, Plaintiff did reach her and was told the reason CHC had requested Plaintiff's medical records was because CHC had denied coverage. Plaintiff then called CHC because she wanted to explain how serious her psoriasis was and how Otezla meant she could live a normal life and not one of pain, disability, decline, and premature death. This conversation was recorded but Plaintiff has not been able to obtain a copy of this recording.

5.7     The first agent was unhelpful. Plaintiff tried to explain the urgency of her need for Otezla. Her sense of urgency was unrequited.  Plaintiff requested to be escalated. The

12

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 12 of 40

second agent explained about the appeal process and how it depended upon the doctor's office taking on active, time-consuming, expensive, and apparently un or under compensated role while the decision-making process essentially remained within the control of the insurance company. However brilliant Dr. Doubleday may be, and he is well respected in his field, Plaintiff feared the process had already proven itself to be beyond his staff's skill level and expressed frustration at this development. However, the skill level of the provider's office did not appear to have been the operative factor in the process. Otezla was listed in the plan's formulary but two CHC agents later asked Plaintiff why she didn't "just get a different plan that would cover Otezla" – unlike her current policy. Dr. Doubleday later said that Plaintiff was "not the only one" CHC was "doing this to." Another patient of his was being denied Otezla. Plaintiff's next insurance company immediately said it would cover Otezla despite CHC's unrelenting denials. Unfortunately, as Plaintiff received very confusing information, it took two months to resume Otezla and her fissures started to return, and one fissure still persists.

5.8    Plaintiff was immediately struck by the parallels of the earlier denial of covered damages that had triggered the disease of psoriasis and she expressed frustration at the ways of insurance companies. The cost of the drug was greater than Plaintiff's yearly income and if her insurance company denied coverage, she would lose her house to pay for the drug.[16] She asked to be escalated a second time and she talked to a person who identified himself as Clint. Clint was aggressively hostile from the moment he got on the call. In the context of responding to Clint's nasty attitude and combativeness Plaintiff

---

[16] The Hurricane Ike Insurance company's layers were not happy with the allegations she made. As she thought of selling her home to pay for the medication, she recalled the insurance company's lawyers' threats to see that she was ruined, bankrupt, and homeless if she persisted.

13

PRIVATE INFORMATION CONTAINED

wanted to call CHC and Clint murderers because she would lose a lot of her life if this drug were to be denied to her. Plaintiff knew such words, even if they resonated within the realm of her hyperbolic truth, would be rude and unproductive. Plaintiff thought she achieved a compromise by scoffing sarcastically that she might as well kill herself because without the medication that was, in fact, her prognosis. The reference was a common rhetorical device and was not treated as a suicide threat at the time it was made. The comment did not elicit any change in Clint's tone. He demonstrated no concern for Plaintiff, her physical health, or her mental well-being and he did not focus on presenting Plaintiff with information helpful to advance her interests or effectively process her concerns.

5.9     In the face of Clint's continued open hostility Plaintiff actively worked on de-escalation of the nasty tone while remaining adamant in her advocacy. Plaintiff believed that CHC probably classified psoriasis as an unpleasant, unsightly, and itchy rash, not as a cripplingly disabling disease with a prognosis of disability, limb amputation, and premature death. Plaintiff was hopeful that if she just explained her circumstances and how serious the disease was in her instance; she could convince him that Otezla was imperative. Plaintiff thought to explain to CHC how she developed the disease and the factors that affected it progression.

5.10    The medical consensus is that the late life development of psoriasis is closely linked to stress and mental health. Plaintiff explained how she had developed psoriasis during a depression that was triggered by an insurance company's fraudulent denial of covered

14

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 14 of 40

benefits after Hurricane Ike.[17] She explained that, with lymphedema, diabetes, and a history of infection, her psoriasis was life threatening. Plaintiff's declining health was fueled by her psoriasis. The years of declining health, excruciating pain, and a growing lack of mobility had put Plaintiff at risk for a relapse of depression. Plaintiff discussed her history of depression and an impulsive suicide attempt, because of developments in her divorce, years before. She had immediately regretted what she had done, called for help and got emergency treatment.[18] She stated she had a risk factor for suicide due to her medical history,

5.11    Plaintiff's partially corrected club foot caused skeletal, muscular, and nerve problems since her mid-twenties. Because she is an ardent environmentalist, she became a vegetarian in the 1970s. She had a short, but brilliant career as a chef because she thought that cooking fabulous food was the most persuasive argument for vegetarianism.

---

[17] Plaintiff refers to her experiences after Hurricane Ike as an Ikemare. She was lied to, cheated, abused, terrorized, discriminated against, and financially ruined. She lived in a home under continuous construction for three years. The insurance company substantially under adjusted her losses and denied her home's structural damages – a central beam in the front of the roof had cracked and the rafters along this beam were no longer nailed to the joists, the lift from the wind had separated them. The attempts to get a fair adjustment delayed her ability to hire the reputable contractor of her choice. The insurance company told Plaintiff that it was their practice to do a preliminary adjustment that left out the "details" and they would update the adjustment by negotiating directly with the contractor (thus appointing them as their agent in adjusting the contract) and her she signed paperwork appointing her contractor (who lacked an adjuster's license and had an interest in the contract-- two separate criminal violations of the insurance code) as her adjuster. This contractor abused this authority to commit insurance fraud and the roof put in collapsed two months later causing extensive new interior damages. There were no reputable contractors and she lived for a total of three years in a construction zone. She was threatened with liens, fines, and violence.  She had $25,000 worth of personal items pilfered from her home. She was man handled, abused and intimidated. When she criticized one contractor's work he kicked a tile wall until it cracked and said that she had better be careful because this was what she deserved. She had gangs of unpaid workers banging on her door in the middle of the night demanding payment. When she lost her home her CPA assessed her out of pocket losses on her home at $185,142.22. She had substantial personal property losses that were also under deliberately under adjusted. An example is her Grandmother's piano. An insurance agent wrote, in a document obviously mistakenly produced, that **the cost to replace Plaintiff's piano started at $18,000,** Claim File at 1037, but the Statement of Loss listed the piano's actual cash value at $3,179.67. Subtracting $1,594.91 for depreciation, Claim File at 1342, Plaintiff received **$1,602.76.** Thus

15

PRIVATE INFORMATION CONTAINED

However, one day at work, her right shoulder, arm, and hand spontaneously and very painfully froze. Her physician recommended that she change to a less physical profession as the freezing of her shoulder and arm were related to the nerve damage caused by her club foot. She also began to have knee and foot pain.  This was before the opioid crisis and Plaintiff had easy access to pain killers, but she did not like being "out of it" and rarely took them. After her impulsive overdose she decided to stop taking any painkillers for chronic pain. When she was first diagnosed with lymphedema after her leg became infected, and she was in dysfunctional pain, she filled a prescription for painkillers but ended up not using them because she couldn't function, such as drive or work, if she took them.

5.12    The only defense to pain that Plaintiff had was her smile. She had read how smiling releases serotonin which helps control pain. And she kept the biggest grin possible on her face and it worked. Continuously smiling like a fatuous idiot reduced her pain levels and allowed her to function. It also dramatically improved her mood. Plaintiff joked that she was never truly happy until she experienced excruciating daily pain. And for everyone who told her she had such a great smile there was another who found her annoying. She couldn't look at people she did not know because they would think she was smiling at them and it freaked them out. She was fired from a new job the day before her leg doubled in size from an infection because a foolish client got annoyed at her and began visibly seething in anger because Plaintiff kept on smiling.[19]

---

[19] It was so ridiculous because the smile was the only thing that stopped Plaintiff from writhing in agony and the young woman thought it was all about mocking her. Plaintiff is filled with compassion because she can only imagine the daily micro affronts that the young black woman, working with a group of old white men at a big oil company, was subjected to that caused her to become so jealous of her dignity. As always, Plaintiff had multiple job offers immediately.

16

PRIVATE INFORMATION CONTAINED

5.13    Plaintiff was doing well. However, about a month before starting Otezla, Plaintiff's psoriasis had flared, she was tired of it and she lay in bed all morning, not wanting to get up and feel the skin on her her feet ripping apart. Plaintiff began ruminating about the constant excruciating pain, her increasing disability, and her risk of diabetic amputation and premature death. She had no present intent to kill herself, but she wondered at what point would her pain and disability become unbearable. But life is full of choices and Plaintiff chose to put on her smile, rise, and face the day. Plaintiff discussed this single incident of suicidal ideation with Clint, not because she was threatening suicide, but because it was relevant to how sick she was, how her health was rapidly declining, and why Otezla was imperative. There was no threat; this incident was presented in the context of her health risk factors and the seriousness of her psoriasis..

5.14    The discussion continued about other topics than Plaintiff's mental health. As Plaintiff made it apparent that she was going to persist in her demands that the insurance company comply with its coverage obligations, Clint's tone suddenly and dramatically changed. Something about it was very off. Plaintiff thought it bizarre that he began expressing sappy concern for her and started interrogating her about her mental health.. He asked if she was suicidal and she said yes in the context of the previous incident but she immediately made it clear that she was not presently experiencing suicidal ideation. Her concern was that if her psoriatic deterioration continued; she was at risk to relapse into a major depression which would in turn aggravate her psoriasis. She said if she became depressed, she would get help.  If suicidal ideation became problematic, she would put herself in a hospital saying sarcastically that such hospitalization would be much more expensive than Otezla.

17

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 17 of 40

5.15    It appears that the change in tone was when Clint had the great idea to call the police and reported a suicide threat. Plaintiff was expressing strong opinions about the wrongfulness of the company's denial of Otezla and indicated that she would forcefully advocate until fulfillment. Plaintiff absolutely denies any statement that indicated any present intention to kill herself. If she had the company would have disclosed the recording instead of refusing to give her a copy. She stated that she would sue for defamation but if she was mistaken in what she remembered she had said and if she made a threat that she did not realize she had made, they should tell her and she would walk away. Her one concern is the alteration or destruction of the recording. It seems that the police may have already destroyed evidence. The police report, that the police said did not exist for several months says the body cam was only on for "the investigation," which is in violation of their published policies. Thus the horrendous abuse plaintiff experienced at NPC, her repeated statements about being in pain from the cuffs, any discussion of the medical emergency that is not in the medical records but necessitated her transport to another hospital, and the mysterious Houston Fire Department officer, who needed the "easy overtime" that Plaintiff provided, and who took off her illegal metal cuffs just before midnight, was not recorded. Plaintiff believes that her narrative probably reveals a scheme of illegal overtime and that she was kept in cuffs for almost six hours solely so that HFD officer could accumulate extra overtime.

5.16    There is no Notification of Detention and neither CHC, Navitus or HPD will tell Plaintiff what Clint said to the police, but it must have been very exciting to send four squad cars post haste to her home. Never in all her 911 calling days when people threaten to kill her, run her down, or when she was defrauded for hundreds of thousands of dollars,

18

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 18 of 40

did Plaintiff receive such a splendid response. Plaintiff was still on the phone with Clint when the police came. An HPD officer, younger than Plaintiff's son, treated the insurance agent as a credible source. The officer never told Plaintiff what the agent said; she was unable to effectively dispute his allegations.  However, the officer asked detailed questions regarding Plaintiff's mental health history that she had discussed with Clint in a way that completely distorted what she said. The mischaracterization of Plaintiff's discussion of her medical history as a suicide threat warranting immediate warrantless involuntary commitment was malicious.

5.17     On April 23, 2019 Plaintiff got the police report that had been withheld. In it the officer says Plaintiff made statements about hurting herself. When she spoke with the officer selective snips of her statements to Clint, mischaracterizing the tone and meaning of her words, were mis-arranged into a cookie cutter summation of "committable." Never deviating from the agent's narrative, the officer asked pointed questions not listening to or giving Plaintiff an opportunity to explain herself. There was no opportunity to talk outside of the prepared script. Plaintiff made the mistake of cooperating honestly. Responding to questions in an investigation about what was said is not repeating or making new "threats." Then the officer asked if she would *ever* kill herself. That question is totally unrelated to the standard for warrantless involuntary civil commitment which requires immediacy. The question was unconditional—without reference to time or place. Plaintiff thought of challenging it but did not want to sound argumentative, she considered lying, but she does not lie and so responded that if she was forced to live in excruciating pain for the rest of her life, she might. She planned to keep talking and put her remarks in context,

19

Certified Document Number: 88493931 - Page 19 of 40

stating she was not suicidal but was at risk of becoming suicidal if, due to financial ruin or losing her legs to amputation, she suffered a relapse into depression.

5.18    Plaintiff did not expect that question and the first sentence of her response to be the end of the officer's investigation. She had expected to continue and put her answer in context but the officer had already made up his mind. Plaintiff presented no evidence of intoxication, irrationality, disorientation, distress, confusion, mania, despondency, catatonia, grandiosity, aggression, hostility, suspicion, paranoia, delusion, or any other form of deteriorated mental condition.[20] She never cried, sobbed, screamed, yelled, threatened, resisted or acted emotionally, dramatically or unreasonably.[21]

5.19    On April 23, 2019when plaintiff finally got the police report that had been withheld she read the officer reported she made statements about hurting herself. She did not. She answered his questions about what she had said and what she had meant. He either did not listen or he did not believe her. Probable cause was projected from the libelous report and the officer's preconceptions. As the examining psychiatrist stated, it was very natural for anyone in Plaintiff's situation to be thinking about how long a life of extreme disability, dependence, and filled with pain, can last. Plaintiff was not thinking about committing suicide. She was speaking to a health care gatekeeper about PHI relevant to the choice of medication to treat a serious and painful that was ruining her health and would most

---

[20] H. & S. Code § 573.012 (c)(1)(the risk of imminent harm can be demonstrated by "the person's behavior"); H. & S. Code § 571.003(14). See *Hobart v. City of Stafford*, 784 F. Supp.2d 732 ( 2011)(schizoaffective disorder, delusions, hallucinations claiming that "he knew all the secrets of the universe"); In re M.R., 02-15-00221-CV (Civ. App.--Fort Worth, November 3, 2015)(detained person was "was responding to visual and auditory hallucinations; responded to the officer's questions with grunting noises; and reportedly had not been bathing, had been soiling himself regularly, had been walking around making growling noises and talking to people who were not there").

[21] H. & S. Code § 573.012 (c)(2)("evidence of severe emotional distress and deterioration").

20

PRIVATE INFORMATION CONTAINED

likely lead to a painful premature death. People with suicidal risk factors must be free to discuss such matters without fear of imprisonment and torture.

5.20    Plaintiff had hesitated before answering honestly but she was acting in an appropriate manner and believed that the officer would hear her out.  Suicide among the elderly is growing at an alarming rate; the ability to access appropriate health care and pain relief is considered a primary factor in this alarming trend. Plaintiff's medical condition somewhat isolated her. She analyzes complex documents for a living and rarely interacts with people outside of her professional circles. She listened and analyzed his words and specifically recall wondering why his question was posed in the form of a unconditional hypothetical. Of course there are circumstances where almost anybody would kill themselves, but she had been arguing with Clint because she wanted to live, not to die.

5.21    Plaintiff remained, calm, controlled and reasonably courteous throughout her interrogation. If the officer had not followed a five minute, one-size-fits-all, prepared script, he would have known that there was no probable cause to detain her. Clint did not present himself to Plaintiff as a pharmacist, but Plaintiff speculates that he must have used his credentials to lend authority to his slanderous assertions.  In order to support an involuntary commitment there must be evidence of a "substantially deteriorating . . . ability to function independently, exhibited by [an] inability to provide for . . . basic needs, including food, clothing, health, or safety." There were none. The only explanation for the minimalist *pro forma* investigation was that the officer had already accepted the expertise of the medical professional and was looking for support of Clint's accusations.

21

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 21 of 40

5.22    Plaintiff is disabled and has a 35-year history of back, arm and hand injuries. This disability is not obvious, but at the time of the detention Plaintiff's wrist was in a medical brace, her right arm and shoulder were injured, and she had recently broken bones in her hand. She had been injured rescuing her elderly puggle from the jaws of an attacking pit bull. Her multiple puncture wounds, from prying the pit bull's jaws apart, had healed but she was still in pain, as she remains today. The officer, following the City of Houston's official policy, shackled her. The officer was objectively aware that the shackling was unnecessary and called his superiors to see if he could get an exception to the City of Houston shackling policy. The officer apologized to her because his superiors directed him to shackle her.  From the moment the officer came to her home Plaintiff was completely compliant and displayed no unreasonable anger, resistance, defiance, or emotionalism. Her courteous and rational demeanor demonstrated that there was never a need "to secure the scene" for the safety of the officer.  The officer directed Plaintiff go inside to get her purse and phone so she could make arrangements for her animals.  The requirements of *Hainze*[22]  were satisfied and the police were required to comply with the ADA. The cuffing soon began to cause Plaintiff great pain. The cuffing violated the ADA. At both facilities she stated the shackles were painful and continued to request that they be removed, but her request was denied. This violated Section 504 of the Rehabilitation Act because she was denied accommodation of her physical disabilities on the basis of her perceived mental disabilities.

---

[22] *Hainze v. Richards, 207 F.3d 795,* 801 (5th Cir. 2000).

22

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 22 of 40

5.23    Plaintiff was taken to the Neuro Psychiatric Center (NPC).[23] She stated she did not consent to examination and asked, the first of many times, to speak to a judge. She was told by NPC, and later at the Ben Taub Emergency Center (BTEC), that she had no right to see a judge. When she brought this failure to comply with Health and Safety Code section 571.012 to the attention of facilities administration and compliance officers, she received a letter telling her that it was the policy of Harris Health to always deny detainees this statutory right to see a judge.[24] Plaintiff was never informed of her right to seek  counsel nor given any "opportunity to communicate with and retain an attorney."[25] She was never "advised that communications with a mental health professional may be used in proceedings for further detention."[26]

5.23    She was never told the exact basis for her detention. She was never informed of her statutory rights.  In fact, when at NPC—humiliatingly, painfully, and unnecessarily shackled to a hard bench—she was told by the individual examining her that she would never be allowed to see a judge nor have further communication with her family or an attorney and would remain painfully shackled, forever if need be, until the facility had subjected her to whatever examination it planned to subject her to. The nature, purpose, and scope of the examination was never explained. She had no idea what that would happen. The woman in the lead was actively and demanding obedience to her demands

---

[23] A peace officer who makes an emergency detention "shall immediately transport the apprehended person to: (1) the nearest appropriate inpatient mental health facility." H. & S. Code § 573.001.

[24] The probate judge or magistrate shall be available at all times at the request of a person apprehended or detained under Chapter 573 . . .." H. & S. Code § 571.012. See also H. & S. Code § 571.002 (The purpose of the Mental Health Code includes "protecting the person's right to a judicial determination of the person's need for involuntary treatment."); 25 Tex. Admin. Code § 404.155 ("The right to communicate with legal counsel, the department, the courts, or the state attorney general may not be restricted.").

[25] H. & S. Code § 573.025(a)(2).

[26] H. & S. Code § 573.025(a)(5).

23

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 23 of 40

without explanation of the process. There was no kindness, concern, or empathy in the woman's manner. She displayed contempt and anger at Plaintiff's requests to be given her legal rights. The officer passively witnessed this illegal abuse. Plaintiff believed that the officer remained to enforce her compliance not only because this was a quasi-criminal matter but, based on the tone already displayed, she was going to be subjected to procedures to which a reasonable person would never willingly consent.

5.24    As a child Plaintiff had undergone abusive experiences that were painful and difficult to process. The cycle of abuse had been repeated in her marriage and plaintiff had been extremely ill with depression. Even though she had regained her mental health through many years of therapy abusive tones and found the strength to leave her abuser, being subjected to such behavior triggers a traumatic stress reaction. Simply put the methods and techniques employed by NPC were specifically designed to retrigger the pain of this past trauma. In light of this sociopathic display of petty tyranny it is very clear to Plaintiff why, in violation of HPD Policy, the officer turned off his body cam. Plaintiff is expecting to discover that most law enforcement body cams are routinely turned off when the officers bring non-criminal detainees to Harris Health institutions.

5.25    Plaintiff also expects to discover that it is the policy of law enforcement agencies to linger after their agencies jurisdiction has extinguished so that, if needed, they can illegally reassert possession of detainees' who are illegally medically rejected. When medically rejected warrantless mental health detainees are returned to police custody without a new intervening cause for law enforcement intervention, this illegal seizure violates the Fourth and Fourteenth Amendments and constitutes a false imprisonment. "The essential

24

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 24 of 40

elements of false imprisonment are: (1) willful detention; (2) without consent; and (3) without authority of law."[27]

5.26    These abusive tactics of control by terror have absolutely no place in a civil society. On paper HPD's policy is that as long as a member of the public is in the control of an officer the body cam must be activate unless a supervisor specifically approves the deactivation of the camera. NPC showed itself to be a sick institution that put an involuntary mental health detainee under the control of a incensed professional utilizing sociopathic techniques to establish dominance.   Plaintiff was overwhelmed by anxiety and felt like she was moving through a surreal nightmare. The fact that officer remained there supervising this outrageous confrontation lent credence to her growing fears. (She did not realize that he had most likely remained to facilitate EMTALA violations.)  Recalling her previous brutalization by a police "investigation" calculated to degrade and humiliate her she began to feel physically ill. She knew that she was trapped in the hands of cruel and sadistic people who had the right to kill her at will. The revelations emanating from the murderous no knock raid two weeks later demonstrates that Plaintiff's fears concerning the culture of HPD were well grounded in fact.

5.24    It was obvious to her that the actions of the woman who appeared to be the supervisor were deliberately provocative and meant to intimidate her into compliance by degradation and humiliation.  Knowing the reputation of HPD she was at all times in reasonable fear for her life. The papers were full of a story about a woman her age, who had been reported to the police as being suicidal. When she turned the police away from

---

[27] *Wal-Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, ___ (Tex. 2002).

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 25 of 40

her door the officers peered into her windows and saw her pickup her cell phone. They immediately shot her and killed her. Because she was considered to be mentally ill her murder was considered justified. Now that Plaintiff has been categorized as mentally ill in public records the authorities have now been given the right to kill her on the flimsiest of pretexts.  Although not enacted law, that policy has the force of law.  One only has to listen to the paranoid rantings of the head of the HPD  unions to know that a siege mentality of fear and distrust that objectifies the public as presumptive enemies Because of the severe prejudice against the mentally ill, all future encounters with authorities put plaintiff at great risk. Any ridiculous misperception, spring from prejudicial bias, absolves the law enforcement aggressor of responsibility for what future potential wrongs.

5.25    When Plaintiff was taken to NPC the only remaining duty of the officer was to file the Notice of Detention, When the assessment began Plaintiff was in the custody of the designated facility. "[C]hapter 573 contains no grant of authority allowing an inpatient mental health facility or mental health facility to reject a person transported by a peace officer under chapter 573 for lack of a medical evaluation and clearance."[28] After Plaintiff agreed to submit to testing and examination NPC asked her medical history, took blood, and checked her vitals. As soon as her vitals were taken the questioning stopped and everyone left the room.

5.26    The woman who had informed Plaintiff she would remain shackled to the furniture forever, without legal recourse, returned and told her she was too sick to stay there. She stated the NPC was only a psychiatric hospital and lacked the facilities needed for a person

---

[28] Attorney General Opinion GA-0753.

26

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 26 of 40

as ill as she was. She was never told what the criteria were for this need of transport and apparently all medical records pertaining to her stay at NPC were shredded.[29]  The officer's report states NPC did not want to admit her for medical reasons. The medical records of BTEC have scant incidental mentions of her transport that are not in the form prescribed by law. She has the "right to an explanation of the justification of any transfer."[30]  Plaintiff has never received this explanation.

5.27    Upon accepting her for evaluation NPC was required to review the use of restraints. In order to continue the use of restraints they must be prescribed by a physician.[31]  Rules adopted by the Texas Health and Human Services Commission for facilities treating individuals detained under section 573 must:

> (1) authorize a registered nurse... trained to assess medical and psychiatric stability with demonstrated competence as required by rule to conduct a face-to-face evaluation of a patient...**not later than one hour after the time the use of restraint or seclusion is initiate**; and
>
> (2) require a physician to conduct a face-to-face evaluation of a patient . . . and document clinical justification for continuing the restraint. . . .[32]

---

[29] "A medical record must be maintained for every individual evaluated or treated in the hospital." 42 CFR § 482.24. "The facility shall establish and maintain a single record for every client beginning at the time of admission. The content of client records shall be complete, current, and well organized." 25 Tex. Admin. Code § 448.508.
[30] Tex. Admin. Code Title 25 § 404.154 (13).
[31] H & S Code § 576.024.
[32] H. & S. Code § 322.001. When restraints are used, the clinical record must document the following:

> **(A)** A description of the client's behavior and the intervention used.
> **(B)** Alternatives or other less restrictive interventions attempted (as applicable).
> **(C)** The client's condition or symptom(s) that warranted the use of the restraint or seclusion.
> **(D)** The client's response to the intervention(s) used, including the rationale for continued use of the intervention.

42 CFR § 485.910 (e)(5)(v).

27

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 27 of 40

These rules were not followed by NPC.  Had restraints been warranted, the police handcuffs were not allowed. "Despite their commercial availability, the following types of devices may not be used to implement restraint: (i) those with metal wrist or ankle cuffs . . .."[33]

5.28    Governor Abbot opined as Attorney General "chapter 573 contains no grant of authority allowing an inpatient mental health facility or mental health facility to reject a person transported by a peace officer under chapter 573 for lack of a medical evaluation and clearance... [A]n inpatient mental health facility or a mental health facility is not statutorily authorized to require a peace officer to transport a person in custody under chapter 573 to a medical facility for a medical evaluation."[34]  Plaintiff believes that once she arrived and was in NPC's custody HPD had no independent authority over Plaintiff. Delegating a duty "does not relieve the...facility administrator from responsibility."[35]  Any transport from NPC must adhere to the rules of medical transport and accomplished in a medically appropriate manner.[36]

5.29    Plaintiff was then taken by the original officer, while she was still in cuffs, to Ben Taub Emergency Center.  The officer was relieved by an HFD officer. They seemed well acquainted as they jokingly discussed that detentions like Plaintiff's were easy overtime. Plaintiff again requested for the cuffs to be removed and this request was denied. Just like the transfer of custody from NPC to the police officer, this further transfer is not reflected

---

[33] Tex. Admin. Code Title 25 Rule § 441.101(75).
[34] Attorney General Opinion GA-0753.
[35] H. & S. Code § 571.007(c).
[36] "The rules must provide that patient transfers between hospitals be accomplished through hospital policies that result in medically appropriate transfers from physician to physician and from hospital to hospital." H & S Code § 241.027(b). *See also* The Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd (EMTALA).

28

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 28 of 40

in the medical records. As a woman Plaintiff had the right to be "transported or

accompanied by a female attendant."

5.30     "A patient receiving mental health services...has the right to...a humane treatment

environment that provides reasonable protection from harm."[37] A "departure from

accepted standards of medical care, or health care, or safety or professional or

administrative services directly related to health care, which proximately results in injury

to...a claimant" is the basis for liability.[38]

5.31     The conditions of treatment for detainees under civil commitment statutes is

determined by the substantive due process clause of the Fourteenth Amendment.

However, an excessive force claim is "brought under the Fourth Amendment" [39] "The

'reasonableness' of a particular use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." [40] "To

prevail on a Fourth Amendment excessive-force claim, a plaintiff must establish: (1) an

injury; (2) that the injury resulted directly from the use of excessive force; and (3) that the

excessiveness of the force was unreasonable." [41] A right is "clearly established" if its

contours are "sufficiently clear that a reasonable official would understand that what he is

doing violates that right."[42]  The court must consider whether a defendant's "actions were

---

[37] H. & S. Code § 576.021(5).
[38] Civ. Prac. & Rem Code § 74.001(a)(13).
[39] *Youngberg v. Romeo,* 457 U.S. 307, 321-22 (1982).
[40] *Green v. City of Mission*, Civil Action 7:18-CV-00049 (S.D. Tex. 2018), *citing Graham v. Connor,* 490 U.S. 386, 393-94 (U.S. 1989).
[41] *Carnaby v. City of Houston,* 636 F.3d 183, 187 (5th Cir. 2011)(quoting *Freeman v. Gore,* 483 F.3d 404, 416 (5th Cir.2007)).
[42] *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

PRIVATE INFORMATION CONTAINED

objectively reasonable" in light of "law which was clearly established at the time of the disputed action."[43]

5.32    The Graham factors provide guideposts to determine if force is reasonable. They are "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to police officers or civilians; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene."  [44]There was no crime, there was no threat, there was no resisting or evasion.

5.33    Immediately upon arrival at Ben Taub Plaintiff was put on a blood pressure monitor. A second detainee, brought to the Ben Taub Emergency Room intake window by another agency, did not have his vitals monitored. They continuously monitored Plaintiff blood pressure. She looked at the reading on the machine and it registered "238" and "160." She was not told what this reading meant; it was never discussed, no treatment was offered. In "a deliberate indifference claim pursuant to the Fourteenth Amendment's Due Process Clause . . . the official must . . . know of and disregard a substantial risk of harm."[45] "[T]he deliberately indifferent state of mind can be inferred 'from the fact that the risk of harm is obvious.'"[46] That reading meant that plaintiff was in hyper tensive crisis and was at immediate risk of major stroke or death. Involuntary detainees have the "right to be free from severe psychological abuse and emotional trauma—both of which are often

---

[43] *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004).
[44] *Lopez v. Harris County*, Civil Action H-15-3077, U.S. S.D. Texas, Houston Division October 7, 2016), *citing Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012), *cert, denied*, 134 S.Ct. 162 (2013).
[45] *Allen v. Kramer*, 1:15-cv-01609 (E.D. Cal. February 25, 2019). *See also M.D. v. Abbott*, 907 F.3d at 252 ("the [State] must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [it] must also draw that inference. This is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight.")(internal citations omitted).
[46] 907 F.3d at 253, *quoting Hope v. Pelzer*, 536 U.S. 730, 737 (2002).

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 30 of 40

inextricably related to some form of physical mistreatment."[47] The immunity provided by Section 571.019(b) applies to court proceedings and "protects the physician from being sued for defamation based on his testimony, not his medical malpractice in the examination itself."[48]

5.34    In *Jane Doe v. Harris County*[49] the court found that withholding health treatment violated the Eight and Fourteenth Amendments and that this was the custom and policy of Harris County:

> Harris County's MD does not substantively challenge plaintiff's § 1983 allegations that it maintained policies and practices of providing mentally ill inmates suffering mental health crises inadequate medical care and failing to protect them from harm, [the allegations] state [a] § 1983 claims for maintaining a policy, practice, or custom of providing inadequate mental health care to unadjudicated detainees . . . . [50]

5.35    When Plaintiff was finally "admitted" to the BTEC, once again no one informed her of her rights, including the minimal disclosures mandated by statute. She made numerous requests to see a judge, and once again these requests were denied. She was not informed of right to counsel nor that statements could be used against her in a court of law. She was given no paperwork of any type. signed no paperwork nor gave anyone the name of, or information concerning her insurance company. She was never told the Harris Health thought that it could bill her. She was not told of HIPAA rights or state law rights regarding her medical records and the officials she have corresponded with afterwards misstated. her rights. She was not told of her right to be transported after detention. Her purse and

---

[47] 907 F.3d at 250, *Citing DeShaney*, 489 U.S. at 200; *Youngberg*, 457 U.S. at 317.
[48] *Rodriguez-Escobar v. Goss*, 392 S.W.3d 142, 165 (Tex. App.--Corpus Christi 2010), *rev'd on other grounds*, 392 S.W.3d 109 (Tex. 2013).
[49] Civil Action No. H-16-2133 (U.S. D.C. Houston Division 2017)(unpublished).
[50] *Id.*

31

PRIVATE INFORMATION CONTAINED

phone were again taken from her and the contents searched. Harris Health wished to do invasive medical testing procedures as part of her examination, but unlike at NPC where a police officer with a gun was enforcing her compliance with medical testing procedures, she dared to refuse.

5.36   "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."  Warrantless searches of a person's body implicate the "most personal and deep-rooted expectations of privacy." "There is no question that the drawing of blood from a person's body infringes an expectation of privacy recognized by society as reasonable."  To have to continuously resist these unwarranted intrusions was very stressful.

5.37   It did not take long for the physician and BTEC medical personal to determine she did not meet the criteria for commitment, and she was released. When she asked how she was to get home the security officer told her to call someone. As her phone's battery had died, the guard dialed a taxi for her and allowed her to speak to the dispatcher. It took her almost two hours from the time that Harris Health states she was allegedly released until she could leave.  After she inquired, Harris Health did not offer to reimburse her stating that, by allowing her to speak to the cab company on their phone, they fulfilled their duty of transport.

5.38   When she returned home, she was in great physical pain from the hours of having her injured arm shackled.  The cruelty and deliberate indifference, the callously "humorous" banter that she was "easy overtime" even while she endured physical suffering inflicted solely because she is disabled, shocked her. That this unwarranted intrusion was incredibly stressful was demonstrated by her dangerous blood pressure

32

PRIVATE INFORMATION CONTAINED

levels. She had never had a diagnosed issue with her blood pressure; she did not know that when blood pressure reaches 180 or above, she was in immediate peril of death or stroke. When her blood pressure spiked, Harris Health did not inform her or treat the condition. They monitored it. BTEC did not "admit" her until the reading was at a level no longer considered life threatening. NPC and BTEC followed a clearly established policy of not maintaining records of transferred detainees. The planned destruction of her medical records with a plausible story reflects scienter. BTEC wrote in her records that she was transferred from non-medical point of origin. Plaintiff believes this was to hide the EMTAL violations. To be considered disposable, to have her life risked hiding the truth that frivolous detentions can cause deadly harm, caused her great emotional suffering. She thinks that the actions of the police and NPC were negligently punitive because those who are considered to have mental health issues are thought to be a species of criminal unworthy of respect or dignity. Jane Doe justice "light" is still Jane Doe justice. In the totality of the circumstances this cause of action shocks the conscience.

5.39    Further investigation revealed that NPC keeps no records of anyone transferred for medical reasons. Thus, no disabled detainee in medical crisis is ever legally transported. No disabled detainee experiencing a medical emergency ever receives appropriate medical care. Plaintiff's medical expert states that the smoothness of the illegal transfer shows that this is a policy that all the actors are familiar with. Plaintiff's wrists, hands and arms were damaged by the almost six hours in cuffs. She was plunged into a deep depression where she experienced extreme suicidal ideation. She suffered great mental anguish and lost income from not being able to work because of this traumatic experience.

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 33 of 40

5.40    Plaintiff received a bill for $1,275.00 from Harris Health and BTEC informed CHC of the detention. The pending insurance payment was $762.90 and Plaintiff's portion was $512.10. Section 571.018 of the Health and Service Code controls the payment of "costs" in an involuntary commitment proceeding. "The costs shall be billed by the clerk of the court conducting the hearings."[51] When a detainee is released after the examination of the physician because the criteria of commitment cannot be met, there is no hearing. Without a hearing, the clerk of the court does not create a bill of costs. Thus although "A county is entitled to reimbursement for costs actually paid by the county from: (1) the patient; or (2) a person or estate liable for the patient's support,"[52] there still has to be a bill of costs prepared by the clerk. A county can get reimbursement from a patient for "costs," but only when they are billed by the clerk of the court in the commitment hearing.   This payment scheme promotes the purpose of the Mental Health Code to "enable[e] the person to obtain necessary evaluation, care, treatment, and rehabilitation with the least possible trouble, expense, and embarrassment to the person and the person's family."[53]

5.41    Health and Safety Code section 611 does not permits the involuntary release of any information about a Section 573 preliminary examination to an insurance company unless there is a specific statutory reason. Mental Health Records underlying a commitment hearing are granted an extraordinary degree of confidentiality. All the cases are filed in the probate courts in a mental health docket segregated from all the other matters. The cases are "a public record of a private nature that may be used, inspected, or copied only under a

---

[51] H. & S. Code § 571.018 (c).
[52] H. & S. Code § 571.018 (d).
[53] H. & S. Code § 571.002 (2).

34

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 34 of 40

written order issued by [a judge with specific jurisdiction.]"[54] Any review of these mental

health records must only occur pursuant to the judge's written order. The order must

contain a finding that:

> (1) the use, inspection, or copying is justified and in the public interest; or
> (2) the paper is to be released to the person to whom it relates or to a person designated in a written release signed by the person to whom the paper relates. [55]

5.42    Plaintiff argued to Harris County that they could not bill her or release her records,

but Harris County says that it can enter into third party agreements that contravene the

statute.

> When patients present to the Ben Taub Emergency Center, it is Harris
> Health's practice to use the demographic information provided by patients
> (e.g., name, date of birth, etc.), to search national databases that identify the
> patients' insurance carrier, if any, for individuals. In your case, Harris Health
> utilized one of these databases and determined that Community Health
> Choice is your insurance carrier. Harris Health has a provider services'
> agreement with Community Health Choice. Pursuant to that agreement,
> Harris Health agrees to provide covered services to all Community Health
> Choice members and Community Health Choice agrees to pay Harris Health
> for all claims submitted by Harris Health for covered services provided to
> Community Health Choice's members. "Emergency services," are a covered
> service. Based on the forgoing, Harris Health billed Community Health Choice
> for the emergency services provided to you because you did not affirmatively
> state that you wanted to be classified as a "self-pay" patient and because
> Harris Health's agreement with Community Health Choice authorizes Harris
> Health to bill Community Health choice for these covered services.  Based on

---

[54] H. & S. Code § 751.015 (a).
[55] H. & S. Code § 751.015 (e).

35

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 35 of 40

> the concerns you raised, Harris Health has revised its practices to affirmatively ask patients who do not provide their insurance information whether they would like to pay for their care or have their insurance billed.

Letter from Chief Compliance Officer Carolynn Jones, March 13, 2019. Thus, it may be that the private mental health records of all involuntary detainees released without commitment are routinely illegally exposed.

5.43    Plaintiff suffered extreme emotional distress and lasting physical injuries due to being in shackles for almost six hours. None of Plaintiff's damages would have occurred but for the willful, wanton, and malicious acts of Clint Doe ratified by CHC.

## VI
## Causes of Action Alleged

6.1    All of the allegations in this pleading contain the basis for Plaintiff's defamation claim. The warrantless mental health detention statute states:

> (a) A peace officer, without a warrant, may take a person into custody, regardless of the age of the person, if the officer:
>     (1) has reason to believe and does believe that:
>         (A) the person is a person with mental illness; and
>         (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and
>     (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody.
> * * *
> (c) The peace officer may form the belief that the person meets the criteria for apprehension:
> (1) from a representation of a credible person;

36

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 36 of 40

There was absolutely nothing in Plaintiff's demeanor that indicated that she was suffering from mental illness as defined by the Mental Health Code. A mental illness is a disease that:

> (A) substantially impairs a person's thought, perception of reality, emotional process, or judgment; or
> (B) grossly impairs behavior as demonstrated by recent disturbed behavior.[56]

6.2     It was obvious to Plaintiff that the officer had been handed a script by a professional and the officer came into the discussion convinced that she was mentally ill and had was threatening suicide. That is not true, and the statements of Clint that convinced the officer that Plaintiff was threatening suicide were libelous.

> A libel is a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.[57]

Plaintiff was severely damaged by her detention. She was physically and painfully injured, and she has both of her hands are badly damaged by the cuffing. The recent Jane Doe Case had wide-spread publicity and Harris County is notorious for its cruel and dysfunctional public mental health system Plaintiff's trauma was foreseeable. Clint Doe is personally liable to Plaintiff and defendants CHC and Navitus are also liable for his acts under numerous agency theories.

---

[56] Tex. Civ. Prac. & Rem. Code Section 571.003 (14).
[57] Civ. Prac. & Rem Code § 73.001.

37

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 37 of 40

6.3     All of the allegations in this pleading contain the basis for Plaintiff's malicious and

wrongful civil proceedings claim.[58]

> In a cause of action for malicious wrongful civil proceedings, the plaintiff must
> plead and prove: 1) the institution or continuation of judicial proceedings; 2)
> by, or at the instance of the defendant(s); 3) malice in the commencement of
> the proceedings; 4) lack of probable cause for the proceedings; 5) termination
> of the proceedings in plaintiff's favor; and 6) damages.

Clint Doe is personally liable to Plaintiff and defendants CHC and Navitus are also liable for

his acts under numerous agency theories.

6.4     A pharmacist is a professional under Texas Health and Safety Code section

611.001(2)(B) as pharmacists are required to use their professional judgment in

dispensing drugs for the treatment of disease. "Communications between a patient and a

professional and records of the identity, diagnosis, evaluation, or treatment of a patient . . .

are confidential."[59] Plaintiff had a right to the disclosure of the records Clint created, and

has the right of injunctive relief to get those records.[60]

6.5     A person aggrieved by the improper disclosure . . . confidential communications or

records in violation of this chapter may petition the district court of the county in which

the person resides for appropriate relief . . .  . . . [including] a civil cause of action for

damages."[61]

---

[58] *Martin v. Trevino*, 578 S.W.2d 763 (Tex.Civ.App.--Corpus Christi 1978, writ ref'd n.r.e.); W. Prosser,
Handbook of the Law of Torts Sec. 120 (4th ed. 1971). *See also*, H. & S. Code §571.020. CRIMINAL
PENALTIES. (a) A person commits an offense if the person intentionally causes, conspires with another to
cause, or assists another to cause the unwarranted commitment of a person to a mental health facility. (b) A
person commits an offense if the person knowingly violates a provision of this subtitle.
[59] H. & S. Code § 611.002(a).
[60] H. & S. Code § 611.005(a).
[61] H. & S. Code § 611.005(a), (c).

38

PRIVATE INFORMATION CONTAINED

6.5     To recover damages for intentional infliction of emotional distress, a plaintiff must

establish that:

> (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe.[62]

That standard is met here. Clint Doe is personally liable to Plaintiff and defendants CHC

and Navitus are also liable for his acts under numerous agency theories.

# VII
# Jury Trial

7.1     Plaintiff requests a jury trial.

# VIII
# Request for Disclosure

8.1     Plaintiff request that pursuant to Rule 194 of the Texas Rules of Civil Procedure

Defendants make all the disclosures listed in Rule 194.2.

# IX
# Relief Requested

9.1     Plaintiff Requests that she be compensated for her financial, emotional and

physical damages, and all costs of suit, pre-and post-Judgment interest and all other relief,

at law or in equity, to which she may be entitled. Plaintiff is filing this suit under a

pseudonym to protect her identity and to protect her family from the pain, suffering, and

loss of privacy that disclosure of her private mental health struggles and her status as a

---

[62] *Hoffmann-LaRoche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004)

PRIVATE INFORMATION CONTAINED

Certified Document Number: 88493931 - Page 39 of 40

rape victim would cause.  Any non-consensual release of her identity would give rise to additional causes of action. Plaintiff anticipates that once all parties are served that appropriate measures to protect Plaintiff's privacy can be developed.

## X
## Prayer

WHEREFORE, PREMISES CONSIDERED Plaintiff Another Jane Doe respectfully requests that she have judgment against Defendants Community Health Choice TX Inc., Navitus Health Solutions, and Defendant Clint Doe for all relief requested

Respectfully Submitted,

*Another Jane Doe*    *(margaret Mitchell)*
**Another Jane Doe**
**Pro Se**
**TBA #14217580**
**5927 Benning Drive**
**Houston, Texas 77096**
**281-352-5286**
**iamanotherjanedoe@gmail.com**

40

Certified Document Number: 88493931 - Page 40 of 40

PRIVATE INFORMATION CONTAINED



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 13, 2020

Certified Document Number:        88493931 Total Pages:  40

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**