UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

**DEC 11 2020**

David J. Bradley, Clerk of Court

MARGARETMITCHELL

(aka ANOTHER JANE DOE),

**Plaintiff**

V.                                                            CIVIL ACTION NO. 4:20-CV-00142

COMMUNITY HEALTH CHOICE TEXAS,                **Jury Trial: No**
INC.;

NAVITUS HEALTH SOLUTIONS, LLC;

THE CITY OF HOUSTON;

HARRIS COUNTY;

THE HARRIS COUNTY HOSPITAL DISTRICT

dba HARRIS HEALTH SYSTEMS;

THE HARRIS CENTER FOR MENTAL HEALTH

### <u>Plaintiff's First Amended Complaint</u>

Comes now Plaintiff, and files this, her First Amended Complaint, complaining of the named

defendants. This amended Complaint adds four new parties.

### <u>Jurisdiction</u>

1.      This Court has jurisdiction under UCS § 1983. Plaintiff sustained injuries when the

official policies of the governmental Defendants violated her Constitutional Rights.

**Plaintiff Apologizes: This Amended Complaint needs Amendment.**

2.      Plaintiff apologizes for this pleading's deficiencies. For sixteen months after her

section 573 detention Plaintiff spent fifty to sixty hours almost every week, while working

1

Plaintiff's First Amended Complaint

full time, in her quest to unravel the truth. She thought the case had been dismissed and became confused. Plaintiff now amends this suit adding insurance code and tort claims against the current Defendants and pursues claims against the governmental entities This Court has jurisdiction because this suit concerns questions of U.S. Constitutional law and the amount in controversy meets the jurisdictional limits.. This imperfect Amended Complaint is being filed now because the issues are too important to risk being lost to a ruling that the destruction of the Notice of Detention does not toll the statute of limitations.

2.1.    Plaintiff will file a Request to Amend her Amended Complaint and a will file her Second Amended Complaint within thirty days of filing this. She will mail this Complaint and a Request to Waive Service of Process to the governmental defendants today. If they do not agree to waive service by next week, she will institute process by December 22, 2020.

**Summary of the case: Denial, Panic, Detention, Torture, and a Criminal Conspiracy**

3    This case arose when Plaintiff, a 63 year old woman who suffers from a severe, disabling, and life threatening variant of psoriasis, learned that her health insurance company, Community Health Choice Texas, Inc., (Community), denied her coverage of Otezla. She called Community and became (rightly) convinced that the denial was wrongful. She requested escalation and Community eventually transferred her call to their pharmacy benefit manager, Navitus Health Solutions, LLC ("Navitus").

**Plaintiff suffered a Panic Attack.**

4.    Ten years before another insurance company had wrongfully and in bad faith denied her covered benefits with disastrous life altering consequences. The stress caused by this previous insurance company's wrongful denial of covered benefits had triggered the onset of her psoriasis. Waiting on hold, convinced her insurance company was misrepresenting her rights,

2

Plaintiff's First Amended Complaint

she suffered acute anxiety. Her blood pressure skyrocketed; she suffered a panic attack. When the first Navitus agent got on the call Plaintiff blurted out that she would kill herself if the company did not approve coverage of the drug. The call was then transferred to Navitus employee Clint Doe who called the Houston Police (HPD). HPD initiated a section 573 involuntary detention.

**The Suicide threat of a Panic Attack is Immediately Forgotten by the victim and it is not a Threat that is accompanied by a risk of Imminent Suicide.**

5.    Panic attacks are of extremely short duration. They can last up to thirty minutes, but seldom do they exceed fifteen minutes. During a panic attack cortisol is released. Cortisol interferes with memory and the person who suffers a panic attack immediately loses their memory of all that transpires during the panic attack. Thus, by the time HPD arrived Plaintiff remembered discussing suicidal ideation, and her risk of suicide should her disease progress untreated, but had no memory of her actual suicide threat. She could not understand why HPD descended on her home brandishing their assault weapons and painfully shackled her causing a disabling injury. The suicide threat in a panic attack is not the result of mental illness as defined by the Mental Health Code. It is the result of anxiety and a transient, stress-induced, hypertensive crisis. **Suicide threats made during a panic attack are _not_ associated with a heightened risk of imminent suicide.**

**Plaintiff was Abused During her Detention.**

6.    Official Houston Police Policy **mandates** that an elderly disabled calm, courteous, compliant, and cooperative section 573 detainees be put in the **same classification** as those **adjudicated to be dangerous violent criminals.** Her wrists and right hand were injured from

3

Plaintiff's First Amended Complaint

the six hours she was kept shackled in two separate health care facilities. She was denied her right to counsel, her right to go to court, her medical records were illegally searched; her confidential mental health care medical records were illegally disseminated; parts of her medical records were destroyed and falsified; and was deliberately denied medical treatment for a potentially life threatening medical emergency. Shocked, she launched an intensive investigation. Her abuse was not an anomaly: the mental health system in Harris County is severely and systematically flawed.

**The Abuse was the result of Official Policies.**

7.      Governmental actors, following official policies, knowingly deny potentially life-saving medical treatment to shackled, non-criminal, disabled mental health detainees and then destroy and falsify material portions of their medical records. Every institutional involved Plaintiff's health crisis has, acting in concert, without legal justification, withheld the information needed for her accurate diagnosis, lied to and about her, participated in the destruction, alteration, falsification or fabrication of legal and medical records, or exposed, or caused to be exposed, her private mental health records protected under Texas Health and Safety Code section 611.

**The Insurance Defendants Are at Fault for the Erroneous Claims Filed.**

9.      Because Plaintiff immediately lost her memory of her panic attack, she could not understand why she was detained. The only explanation that made sense to her was the filing of a false report. She repeatedly requested to hear the recording of her phone call and wrote that if she was wrong about not making a suicide threat (rather than discuss her risk to relapse into depression and have suicidal ideation), they should let her hear the recordings. She stated that she would not go forward with this suit if she had made a threat. But the Insurance Defendants

4

Plaintiff's First Amended Complaint

refused to respond. Because the statute of limitations for defamation is one year, as opposed to other tort claims that are two years, she filed a suit against Community Health Choice Texas, Inc. ("CHC") and Navitus Health Solutions, LLC ("Navitus") (collectively the Insurance Defendants) and Clint Doe alleging defamation, "malicious and wrongful civil proceedings," violation of Chapter 611 of the Texas Health and Safety Code, and intentional infliction of emotional distress.

**The Defendants Knew Plaintiff's Family would be hurt by Unwarranted Exposure.**

10.    Plaintiff had not initially sued the government defendants because of personal and financial limitations. Another reason, and why she filed under a pseudonym, is her son was a felony prosecutor in Harris County. He worked with HPD every day. He feared the professional and personal repercussions. She discussed and exchanged emails about this with the Insurance Defendants' attorneys.[1]

**The Insurance Defendants Maliciously Published Privileged Materials**

11.    As soon as Community answered Plaintiff contacted their attorney, John Shely. On January 14, 2020, Plaintiff emailed him offering to dismiss the case if her recollection of the phone call made to Community was incorrect.

> **If I am wrong about what I said to Clint I will dismiss the defamation cause of action.**
>
> If a reasonable person, listening to the recording of our conversation, could have been concerned that I made an imminent suicide threat, or, if I listen

---

[1] See, e.g., Plaintiff Email to Tim Hudson February 10, 2020. "John Shely had told me he would work with me on keeping my name out of the case but then he removed the case with my name a-blazing * * * As I told you, my concern is not for myself, but I think **my son would be very uncomfortable to be labeled the felony prosecutor [whose crazy] mother was tortured by the police that he works with every day.**"

Plaintiff's First Amended Complaint

> to Clint's call to the police and it is reasonable description of our conversation, I will drop my defamation action. I do not discount the possibility of police incompetence and over reaction. I have no desire to bring false claims. But I have never been allowed to have access to these recordings to verify my recollections and understanding.   *   *   *[2]

The day after Plaintiff's offer to dismiss the case Community, with the Navitus' Consent, removed the case to federal court. Community argued that the allegations not pled, but which had compounded her injuries, conferred Federal Question Jurisdiction. Plaintiff had no response from Community regarding her offer to dismiss the case. On February 9, 2020, Plaintiff emailed Navitus' attorney ***to reiterate her unconditional offer to drop this suit if the recording of her call proved her wrong and that she had made a credible suicide threat.***

> Dear Sir:
>
> You may be aware that before I filed suit I told your client, and your client's co-defendant, Community Health Choice, that I would not file suit if, after listening to the recordings of my conversation with Mr. Schely, [aka "Clint Doe"]  my memory was incorrect and I did state a credible suicide threat and his report to the police was reasonably accurate.
>
> After I filed suit I repeated a this offer to Mr. Shely. I told him to tell his client that I would dismiss my defamation and wrongful prosecution claims if an accurate recording shows that I made a credible suicide threat. I repeat this offer to you. Please convey this offer to your client.[3]

12.    On February 18, 2020, sixteen months after Plaintiff first requested the recording she came home and saw Navitus had sent the recording by email. She emailed the attorneys:

> I will listen this weekend.
>
> I asked for this repeatedly and now that I have access it's surprisingly hard to even think about; it is difficult to reopen that night. But I will soon.

---

[2] Plaintiff Email to John Shely January 13, 2020.
[3] Plaintiff Email to Tim Hudson February 9, 2020.

6

Plaintiff's First Amended Complaint

Best to you,

Margaret[4]

13.    Before Plaintiff could listen to that very personal recording, Navitus filed a Motion to Dismiss attaching a transcript of the recording of that part of Plaintiff's call to Community after Community transferred the call to Navitus. The recording was the key to understanding what happened on December 10th. Although she still has no independent memory of her remarks to Navitus agent Becca, it refreshed her memory as to the moments surrounding the panic attack. She was finally able to get a proper diagnosis. She immediately dropped her defamation and malicious prosecution claims. Upon learning, contrary to Community's representations, that Clint Doe was not a registered pharmacist,[5] Plaintiff voluntarily dismissed her claim for relief under Chapter 611 of the Texas Health and Safety Code against Defendant Clint Doe.

**The Withheld Recording Was Crucial for Plaintiff to obtain an Accurate Diagnosis.**

14.    If Plaintiff had been allowed access to the recording in December of 2018, she may have lacked much of the fervor to investigate and uncover the coordinated policy to bypass EMTALA. Her detention had been a Kafkaesque absurdity. Even if she had investigated and decided to litigate, the recording would not have been relevant or material to the EMTALA, her right to counsel, payment, and other issues. In that speculative litigation she would have understood why she was detained. With her memory restored she was finally able have a psychiatrist give her an accurate diagnosis of her medical and mental condition on the night of December 11.

---

[4] Plaintiff Email to Tim Hudson February 18, 2020
[5] Not only was Plaintiff was entitled to consult a registered pharmacist *before* the denial of the drug was finalized, Community's lie, that Clint was a registered pharmacist, imbued his acts with an expertise he did not possess.

7

Plaintiff's First Amended Complaint

**Plaintiff Thought that the Case had been Unfairly Dismissed.**

15.     Plaintiff immediately and unconditionally dismissed the Navitus employee as well as the  defamation and malicious prosecution claims. Because of the acts of the Insurance Defendants' attorneys she did not dismiss the Intentional infliction of emotional distress and Texas Health and Safety Code section 611 claims. She suddenly saw that her defamation claim was a red herring preventing her from focusing on the Insurance Defendants' statutory and contract breaches. She was preparing to advance these claims when the Court, without notice, dismissed the entire case. Almost a month later, the clerk said that the dismissal was filed in error. When she received no order withdrawing the dismissal nor reinstating the case, she thought the case was over.

**This Amended Complaint**

**The Parties**

16.     Pro Se Plaintiff, a sixty three year old Houston resident, qualifies as a covered individual under the American with Disabilities Act. Plaintiff has a partially corrected club foot, arthritis, and psoriasis. In the past she has suffered from depression. She is currently diagnosed with anxiety and panic disorder. Her anxiety has made it very difficult to prosecute this suit but the issues involved are so important and there is no one else who will undertake it, so feels that she has no choice but to continue.[6] When she was young she was sexually assaulted by both a treating physician and a law enforcement officer. She experiences high anxiety when she interacts with either profession.  When she had started Otezla Plaintiff had Type Two Diabetes,

---

[6] Plaintiff has also been diagnosed with a circumstantial mind. A person with a circumstantial mind is one who pays excessive attention to detail yet does not lose site of the main point. Plaintiff has tried to limit her inclusion of details while communicating her major points.

8

Plaintiff's First Amended Complaint

high cholesterol, and lymphedema. These comorbidities have gone into remission and her psoriasis and arthritis are now moderate. Every time her Otezla has been discontinued her psoriasis roars back and is less responsive to Otezla. Plaintiff has been a licensed Texas attorney since 1986. She was admitted to both the Southern District of Texas and the Fifth Circuit, but she let those admissions lapse in 1992 when she became a stay at home mother for eighteen years.

17.     Defendant Community Health Choice Texas, Inc (Community) is a Texas Managed Care Organization affiliated with the Harris Health System. Community offers Health Insurance Plans through the Health Insurance Marketplace. Plaintiff purchased an individual healthcare insurance policy with Community and was in her second year of coverage in December of 2018. Community was served and filed its Answer on January 6, 2020 through its attorney, John Shely of Hunton Andrews Kurth LLP.

18.     Defendant Navitus Health Solutions, LLC, (Navitus) a Wisconsin Limited Liability Company, is Community's Pharmacy Benefits Manager. Navitus was served and on January 10, 2020 answered and filed Special Exceptions through its attorney, Timothy Hutton of Thompson & Knight LLP. Defendant Clint Doe, the pseudonym used for an employee of Navitus, was never served, and was dismissed with prejudice by Plaintiff.

19.     Defendant the City of Houston, Texas (the City or Houston) is a municipal corporation governmental entity and a political subdivision of the State of Texas that may be served with process by serving Pat J. Daniel, Interim City Secretary at P.O. Box 1562, Houston, TX 77251, her email is citysecretary@houstontx.gov. The Houston Police Department (HPD) and the Houston Fire Department (HFD) are departments of the City of Houston. Art Acevedo is the

9

Plaintiff's First Amended Complaint

policy making official of HPD. HPD is a member of a joint mental health task force the Crisis Intervention Response Team (CIRT). The City and HPD have actual and timely notice of Plaintiff's claim. CPRC § 101.101(a). Alternatively, it is estopped from asserting any statute of limitations defense as no entity will produce the Notice of Detention and HPD admits not filing it in a timely and appropriate manner. Plaintiff has requested that the City waive service of process and accept service according to the Covid Order now in place.

20.    Defendant Harris County is a unit of local Government of the State of Texas and may be served by process upon the Harris County Judge, the Honorable Lina Hidalgo, 1001 Preston Street, Suite 911, Houston Texas, 77002.  The Harris County Sheriff's Office (HCSO) is a subdivision of Harris County and does not enjoy a separate legal existence. HCSO is a member of CIRT.  Harris County has actual and timely notice of Plaintiff's claim. CPRC § 101.101(a). Alternatively, it is estopped from asserting any statute of limitations defense as no entity will produce the Notice of Detention. Plaintiff has requested that Harris County waive service of process and accept service by email according to the Covid Order now in place.

21.    The Harris County Hospital District dba Harris Health System (Harris Health) is a unit of local Government of the State of Texas that owns and operates Ben Taub Emergency Center. Harris Health may be served with process by serving its President and Chief Executive Officer George Masi or any other officer at 2525 Holly Hall, Houston Texas, 77054. Harris has actual and timely notice of Plaintiff's claim. CPRC § 101.101(a). Alternatively, it is estopped from asserting any statute of limitations defense as no entity will produce the Notice of Detention.. Plaintiff has requested that Harris Health waive service of process and accept service by email according to the Covid Order now in place.

10

Plaintiff's First Amended Complaint

22.     Defendant The Harris Center for Mental Health and IDD (Harris Center) is the Component Unit of Harris County[7] that owns and operates the NeuroPsychiatric Center (NPC) a community crisis center. The Harris Center is the state-designated Local Mental Health Authority and Local Intellectual and Developmental Disability Authority serving Harris County under Texas Health and Safety Code Chapter 534.054. The Harris Center directs the HPD and the HCSO in CIRT. The Harris Center makes policy decisions for guiding CIRT activities. The Harris Center may be served with process by serving Wayne Young, its CEO, at 9401 Southwest Freeway, Houston Texas 77041. The Harris Center has actual and timely notice of Plaintiff's claim. CPRC § 101.101(a). Alternatively, it is estopped from asserting any statute of limitations defense as no entity will produce the Notice of Detention and NPC was the entity with which the Notice of Detention ought to have been filed. Plaintiff has requested that the Harris Center waive service of process and accept service by email according to the Covid Order now in place.

23.     Plaintiff will not name nor seek damages from any first responder. Her gratitude for their service, and society's need for their undivided attention, outweigh other considerations.

**Community Denies Coverage of Otezla for Psoriasis, a Deadly and Disabling Disease**

24.     On December 10, 2018 Plaintiff was told by her new dermatologist's office that her health insurance company, Community Health Choice Texas, Inc. (Community), had denied coverage of Otezla. Otezla is an expensive medication that had miraculously restored the quality

---

[7] The Harris Center for Mental Health and IDD COMPREHENSIVE ANNUAL FINANCIAL REPORT For Fiscal Years Ended August 31, 2019 and 2018 available at https://theharriscenter.org/Portals/0/Comprehensive%20Annual%20Financial%20Report%20FY2019%20FINAL.pdf.

11

Plaintiff's First Amended Complaint

of her life immediately after she started it. Plaintiff knew that psoriasis, the disease Otezla was prescribed for, is not commonly considered life-threatening. However, it is a cruel, painful, and relentlessly lethal disease. If a woman is diagnosed with psoriasis before the age of twenty-five, her life expectancy is reduced by twenty five to thirty years, which is a greater reduction than Type 1 diabetes. For a woman diagnosed later in life, like Plaintiff, the average reduction in life expectancy for moderate to severe psoriasis is ten years. Plaintiff's psoriasis is unusually severe. Her health had declined significantly as the psoriasis triggered multiple comorbidities.[8] Plaintiff did not need statistics to know that psoriasis was killing her. Plaintiff believed that Community could not have understood how seriously ill psoriasis had made her. She thought if she explained Community would reconsider the evidence and approve the drug.

25. Diagnosed in 2010 Plaintiff's psoriasis concentrated on the bottoms of her feet, it progressed relentlessly. A disease of opportunity, it is probable that the location of her psoriasis was influenced by her club foot. Plaintiff's club foot was independently disabling. Plaintiff worked in restaurants as a teenager; by the time she finished college she was an ambitious chef working sixty to seventy hours every week. One day she raised her right arm. Her right shoulder, arm, and hand painfully seized; her back began uncontrollable spasms. She had to undertake months of therapy to restore her hand and arm's function.[9] Her physician explained that the

---

[8] That Plaintiff's arthritis and lymphedema independently improved dramatically, and her diabetes and high cholesterol were cured after Plaintiff started taking Otezla, despite no other form of medical intervention, supports Plaintiff's assertion these are comorbidities of her psoriasis, not independent medical conditions.

[9] Plaintiff calls her transiently appearing club foot arm injury "an Igor," after the lab assistant in the old monster movies. His shuffling gait is a model for the zombies to come. As he drags his club foot, he holds his back rigid, the range of motion in the neck is reduced, his shoulder is hunched up, his frozen arm is held slightly in front with his hand clenched in a claw-like fist.

12

Plaintiff's First Amended Complaint

club foot caused misalignment that was not fixable, intense labor would accelerate the problem. He advised that she change professions.

26.    By the time Dr. Doubleday prescribed her Otezla Plaintiff had lived with multiple psoriatic fissures on both of her feet every day for over five years. When she did not use her feet for several hours, for instance while she slept, the fissures plaqued over appearing to heal. This healing was illusory. The moment she used her feet the fissures reappeared; she could feel the skin on her feet ripping apart. Because these fissures traveled up the sides of her feet she only wore flip-flop style sandals; all other types of shoes were too painful. This fissure/plaque cycle was relentless; expensive treatments seldom worked better than Vaseline. When home alone, if her fissures were plaqued over, she routinely crawled on her hands and knees to avoid reinitiating this painful fissure/plaque cycle.

27.    Plaintiff she was returning to the workforce after eighteen years of being a stay at home mother when she developed psoriasis. Psoriasis prevented her from returning to litigation; any stress causes a major flare. Despite specializing in the document review niche, flares forced her to leave several jobs. When very stressed the psoriasis sometimes appears on her hands[10] and she has developed up to fifty fissures on each foot. These were so deep that, like the stigmata, the fissures bled, disappeared overnight and reappeared bleeding the next day.

---

[10] Palmoplantar psoriasis is "arguably the most difficult type to live with as it interferes with the ability to perform a wide variety of daily tasks." Lia Tremblay (Medically reviewed by Casey Gallagher, MD), *An Overview of Psoriasis of the Hands and Feet, Understanding Palmoplantar Psoriasis,* August 25, 2020 available at https://www.verywellhealth.com/treating-psoriasis-on-your-hands-and-feet-3889999. Plaintiff's Psoriasis first appeared on her hands when she was working on site at Vinson Elkins.

13

Plaintiff's First Amended Complaint

28.    The wounds on one foot became infected. Her leg doubled in size and the infection triggered lymphedema. After that both legs would swell. She was told that if her fissures became infected again she faced amputation. Life expectancy after such an amputation is a year and a half. A wound care specialist told her that there was nothing that he could do to heal her psoriatic wounds. Many physicians she saw assumed that she was on full disability. When they discovered she had never even applied, several urged her to apply and offered to testify on her behalf.

29.    Three days after starting Otezla Plaintiff's fissures disappeared. Within weeks her arthritis pain began to diminish. She was sure that Community had denied Otezla because it had assumed her psoriasis was an unpleasant and unsightly rash. When Community learned that it was a slow, painful death sentence that substantially diminished her quality of life, surely they would reconsider the denial of coverage.

**Plaintiff Had Not Believed She Made a Suicide Threat.**

30.    Plaintiff spoke with at least two agents of Community before Community transferred the call to Navitus Health Solutions, LLC (Navitus) (Community and Navitus are collectively referred to as the Insurance Defendants). This early portion of the call was omitted from the call transcript attached to Navitus' Motion to Dismiss. Plaintiff's recollection is that the Community agents told her the decision was final and could only be reviewed by a time consuming formal appeal. Plaintiff, in trying to describe how devastating her disease was told Community that in addition to the comorbidities which would kill her if it continued she would develop depression. She shared despairing thoughts she had just weeks prior to starting Otezla. Those thoughts were unusual because Plaintiff had learned how to be upbeat. She read smiling

Plaintiff's First Amended Complaint

releases pain-killing Serotonin, so she put on a big fake smile. She experienced substantial pain reduction. She began smiling all the time; a side effect was her good mood.

**A Bad Morning, Decades of Chronic Pain**

31.     Approximately one month before Dr. Doubleday gave her the Otezla starter pack, Plaintiff tired of the pain, and reluctant to get up and have her feet start to rip apart, stayed in bed all Saturday morning uncharacteristically ruminating. She wondered how would she cope when she faced the inevitable amputation: at what point would life be unsupportable? Was death preferable to being a disabled dependent living in constant pain? She believes she told Community that this was a risk factor that should have been assessed in the decision to deny her the medication. She had suffered from depression in the past, and almost twenty years before she had impulsively overdosed on pain killers. After that overdose she stopped taking all prescription pain pills for her chronic pain. Even though physicians have offered to prescribe her the full range of painkillers, she still maintains her decision to abstain from all narcotic painkillers to treat her chronic pain.

**Systemic Prejudice in Texas Courts against those thought to be Mentally Ill**

32.     Plaintiff's prior overdose was not associated with depression or mental illness. It was a drunken impulse. Plaintiff is an infrequent drinker; when she imbibed that evening, she was strongly affected. Her divorce had just been finalized and her high powered divorce lawyer, Earl Lilly, had just told her he entered into an agreement against her interest with her ex, and her exes attorney, Wendy Burgower who was the elected head of the family law section of the Texas State Bar. Certain sums of money listed as Plaintiff's in the divorce decree would not be

15

Plaintiff's First Amended Complaint

paid to her.[11] Lilly told her that given the amount of money that he could charge her, that was the best agreement he could make. It was in Plaintiff's best interest to settle as she could never successfully fight her super lawyer ex. As she would not settle for what her ex was willing to offer, the three super lawyers agreed amongst themselves that they would have her sign an agreement, but she would not be entitled to collect certain sums and assets listed as hers.

33.     Lilly said he had authority to make that agreement on her behalf. Plaintiff replied that by the terms of the decree all prior agreements were extinguished. Lilly said it would be unethical for him to seek to have the Decree enforced contrary to the terms of this agreement. Ethical cannons forced him to immediately withdraw from representing her.  Her ex and Lilly had represented to her that for their child's sake, her ex wanted an amicable divorce. Plaintiff had immediately called her ex who crowed about how he tricked her into a terrible settlement.

**Who's "Crazy, Crazy, Crazy?"**

34.     Without an attorney Plaintiff called Burgower to discuss the sums due.  Plaintiff's sister had called her ex  thinking that he would be concerned. Plaintiff than experienced "classic Burgower."[12] Burgower instantly launched into tirades about what a shame it was that Plaintiff had not died, how Plaintiff should kill herself right then and make the world a better place.

---

[11] Some of the money Plaintiff's ex refused to pay had been designated as child support. Plaintiff requested the child support enforcement division of the District Attorney's office collect it for her. The DA's office said that for the sake of the children it was their official policy to honor such verbal agreements even when they conflicted with the signed decree.  It was only after I forwarded the draft petition of a class action law suit on behalf of myself and all other mothers similarly situated that the child support enforcement division garnished my exes wages for the child support listed in the decree that he had refused to pay.

[12] It was no wonder the family law bar supported Burgower as section chief of the family law section of the Texas bar: Every attorney she spoke with as she sought to replace Lilly with told her that Burgower was so combative their fees would always be two to three hundred percent higher than they would have otherwise been against a different opposing counsel.

16

Plaintiff's First Amended Complaint

When Plaintiff tried to speak Burgower would chant "Crazy Crazy Crazy! You're Crazy Crazy Crazy!" in a sing song voice. **Plaintiff complained but even when Burgower repeated that she should kill herself in court, the judge refused to admonish her.**

35.    Plaintiff had wanted the security of a big gun like Lilly to protect her from her abusive ex. But she was destined to have no gun at all. One evening Plaintiff called 911 three times as her ex broke into her house. After the third call Plaintiff was in the street chasing the dogs her ex had let escape. Her ex gunned his car at her; she had to jump out of the way to avoid being run over and killed. Forty-five minutes after her first call the police called her back, asking if she still needed them. She said yes, she wanted to file a report about her ex trying to run her down. The police said that since it was her ex-husband that tried to kill her, this was a civil matter. They refused to dispatch officers or take a report. Their policy was not to interfere with domestic disputes. Without a protective order they would do nothing.[13] HPD Policy allows the abuse of woman.

**A Drunken Impulse, Sober Reflection.**

36.    That night Plaintiff angrily and impulsively overdosed. As soon as she swallowed the pills she had a moment of clarity and realized she could never do such a stupid, cruel, and

---

[13] They advised her to include everything in the protective order because in domestic disputes the police only investigated acts of violence forbidden by the protective order. Plaintiff did not waste her time to get a court order. Shocked that her ex was blatantly flouting the existing court orders she went to the courthouse to review the file. She found that the major order in the file had been extensively hand modified. She expressed shock to the court's clerk. The clerk said it was standard procedure for the judge to review and "improve" the orders; this happened all the time. Plaintiff ordered a certified copy of the improved order, but it disappeared. After seventy thousand dollars of post divorce attorney's fees none of the judge's rulings made sense until he, and numerous other Harris County family law and probate court judges, mired in public corruption scandals, all agreed not to run for reelection in lieu of prosecution.

Plaintiff's First Amended Complaint

irresponsible act. She immediately sought medical help and left the hospital the next morning. After that, in addition to foregoing pain pills, she found offhand threats or jokes about suicide unacceptable. She asks friends never to make such flippant comments to her. However, she talks openly and appropriately about suicide and suicidal ideation. This practice reinforced her belief that, although she talked about risk factors to Community, she did not threaten suicide. She believes she told Community that this recent episode of rumination over the progression of her disease meant that her disease put her at risk for a relapse into depression. She believes she discussed her risks if the medication were denied and her disease's progression resumed.

**The Ikemare which triggered her Panic Attack**

37.    In her call to Community Plaintiff thought if they had not considered all relevant factors in the denial, their failure to allow any reconsideration other than a formal appeal made no sense. Even though she was unfamiliar with her rights under Texas Insurance Code section 1369.0546, she was sure Community was misrepresenting her rights. Because she got psoriasis as a direct result of another insurance company's fraud and wrongful denial of coverage she immediately conflated the denials. While she was on hold being transferred to Navitus this conflation triggered her panic attack. She asks the court to take Judicial Notice of her Hurricane Ike case *Margaret Mitchell v. State Farm Lloyds, Paul Summer, Carol Turner, Alden Roofing and Renovations and Al Ellis d/b/a Art Scapes & Crafters,* (the Ikemare) filed on July 22, 2010 by Jeff Raizner of Doyle Raizner.

38.    When she first spoke with Clint she explained her the origin of her psoriasis.

> Eight or nine years ago, I developed psoriasis on the bottoms of my feet. Now
> I was born with a club foot that wasn't fully corrected. And so for, you know,

18

Plaintiff's First Amended Complaint

all my life, you know, I've had issues with my club foot. You know, you've seen the -- I don't know how familiar you are with club feet, but you know, on occasion my right arm freezes, and my hand freezes into that ball because of the referred nerve damage, you know, of the club -- of the club foot. So I have substantial nerve damage on the bottoms of my feet. After hurricane Ike, State Farm Insurance company -- even though in their claim file said that I have structural damage to my home from the hurricane -- denied the structural damages. It was a big (inaudible) deal. We're still in litigation. And anyway, they denied it. I ended up getting a crummy contractor that put the roof on without correcting the structural damages. The new roof collapsed, causing $70-80,000 more worth of damages. I was in construction for three years. I ended up selling my house at a $200,000 loss because the next contractor put all the floors in wrong because all the floors were destroyed. And so, as you can imagine -- and in that three year construction ordeal, I had, you know, numerous, you know, guys -- you know, gangs of people f who didn't speak English knocking at my door at 1 o'clock in the morning demanding payment that I had given to the contractor, to the sub-contractor. In other words, it was an horrendous ordeal. I had

$25,000 worth of items pilfered out of my house, and my boyfriend died in a motorcycle wreck. So I got very depressed, and I didn't get out of bed for over a month, except to go to the bathroom and stuff. And I got rashes and everything all over my body, including psoriasis.

So the psoriasis, until this last year, has only attacked me on the bottoms of my feet. And so for the last eight or nine years, I've had bleeding fissures on my feet every single day of my life, up to 40 bleeding wounds on the bottoms of my feet. I have tried so many drugs. I have done, like, Taclonex which costs $600 a month, which didn't do any good. I've been doing this drug and that drug and this drug and that drug. I mean, it's been a major -- I've not been able to take jobs because any job where I was stressed, my feet would just flare. Two -- two years ago, I got a major infection in my leg from the open, bleeding wounds, and

19

Plaintiff's First Amended Complaint

open, bleeding wounds, and ever since then, my left leg has been swollen with lymphoma. And I have, you know -- like, obviously I can't exercise. I got depressed. I got anti-depressants because of the depression, because, you know, of this severe, excruciatingly painful, completely disabling psoriasis, and I gained 60 pounds. Then now I've gained 60 pounds with the anti-depressants with open, bleeding wounds on my feet every day of my life, getting major -- you know, major infections. My left leg has been swollen for two years from the lymphoma –

* * *

And finally, finally I get Otezla, and it works. Within three or four days of having Otezla, I no longer have bleeding wounds on my feet, and I'm no longer in excruciating pain every single day. My pain is so bad, if I -- because if I sit for any length of time or lie down when I go to bed and the wounds start to the heal. And so the first 40 or 50 steps are incredible painful. So when I have to go to the bathroom at night, do I walk to the bathroom? No, I crawl on my hands and knees. And Otezla has been denied me? I will kill myself. I will kill myself if you do not give me Otezla again.

* * *

After hurricane Ike, State Farm Insurance company -- even though in their claim file said that I have structural damage to my home from the hurricane -- denied the structural damages. . . . I ended up getting a crummy contractor that put the roof on without correcting the structural damages. The new roof collapsed, causing $70-80,000 more worth of damages. I was in construction for three years. I ended up selling my house at a $200,000 loss because the next contractor put all the floors in wrong because all the floors were destroyed. And so, as you can imagine -- and in that three year construction ordeal, I had, you know, numerous, you know, guys -- you know, gangs of people  of who didn't speak English knocking at my door at 1 o'clock in the morning demanding payment that I had given to the contractor, to the sub-

20

Plaintiff's First Amended Complaint

contractor. In other words, it was an horrendous ordeal. I had $25,000 worth of items pilfered out of my house, and my boyfriend died in a motorcycle wreck. So I got very depressed, and I didn't get out of bed for over a month, except to go to the bathroom and stuff. And I got rashes and everything all over my body, including psoriasis.

**Raizner Razes**

38.    When regulatory and law enforcement agencies failed miserably to regulate, Plaintiff turned to the courts. Before Plaintiff sold her home, in a rising market, at a just less than $200,000.00 loss, she hired Doyle Raizner. Doyle Raizner had hired an expert who prepared a report finding an $180,000 under-adjustment. Raizner told Plaintiff that they would seek to treble that amount as well as her personal property losses. They went to mediation and the former judge of the MDL court was the mediator. Plaintiff, who had been told by Raizner that they would be seeking about $600,000. was ambushed.

39.    Her attorney demanded she immediately settle for $30,000, an amount that netted her several thousand dollars less than the depreciation owed. He stated that if she did not settle immediately he would resign as her attorney. The mediator told her to not waste his time said she needed to settle without any discussion. Her attorney barely spoke to her and left the room with the mediator, to "hang out" with his "best friend" opposing counsel Ronald Schramm. He allowed the mediator to aggressively abuse, mock, and belittle Plaintiff in an angry manner. After the mediation that Raizner told her that he intensely disliked her, and she had been the most annoying client he had ever had.[14] Months later Plaintiff made a remark to Schramm about

---

[14] Apparently Raizner's dislike stemmed from her circumstantiality. Medical literature indicates the "problem" with circumstantiality is that its obsessive compulsive attention to detail can be very annoying to those who are not detail oriented. He had asked her to outline her damages and,

21

Plaintiff's First Amended Complaint

Raizner.. Schramm told her she better be careful about criticizing Raizner: she should hear all the nasty things Raizner was telling *everybody* about her. After she had filed her amended pleadings with her allegations regarding how she had been treated in the mediation this same attorney told her if she persisted State Farm would make sure that her life was ruined.

**Texas Judges do believe that Mentally ill People are less Valuable.**

40.     Plaintiff told the mediator that she had been very upset about her ordeal and she suffered a relapse of her depression. The mediator expressed disdain and contempt saying she should be ashamed to admit depression – it devalued her case. She would be shunned and unemployable if people found out about her mental illness. Nobody believes anything said by a person with mental illness. The judge would be "very angry" and punish her if she refused the $30,000 settlement. He physically leaned over Plaintiff in a menacing and bullying manner,. "getting into her face." When Plaintiff experienced such extreme anxiety she froze, unable to move or speak the mediator mocked her: she had nothing to say because everything she said was a lie.

---

as she had worked on the TWIA defense docket, share her thoughts. Plaintiff spent two years writing her LLM thesis on hurricane insurance law. She had read *every* case and law review article in Westlaw and Lexis with the terms hurricane and insurance, or hurricane and flood, or flood and insurance. She followed the hurricane MDL and reviewed every case that her lawyers had filed in Harris County. Raizner's firm had several forced place mortgage insurance cases. There were winning arguments, but Doyle Raizner's theories had been rejected by the Fifth Circuit and other state's supreme courts. In addition to detailed presentations about her damages and her legal theories she mentioned some forced place cases that had winning theories. Leaving the mediation Plaintiff hit a nerve when she asked what he about her legal research. Raizner responded that she was the most annoying client he had ever had; he was so glad he would never waste any more time reading her long, stupid, harassing emails.

22

Plaintiff's First Amended Complaint

When Plaintiff asked the mediator to stop being abusive Raizner and the mediator laughed, making jokes about how nasty the mediator used to be when he was a judge.

41. The proposed six sentence settlement did not include a defaulting party, liability for future acts, nor name the two State Farm agents sued. Acting stupid, Plaintiff said the settlement offer did not include the individual defendants so when the mediator interlineated them she signed. Repudiating the mediation, Plaintiff asked the court to enforce the settlement amending her pleadings to add twenty five additional agents whose material misrepresentations were documented in the claims file. The court abated the additional claims in the suit for almost two years while the settlement was litigated.

**Mentally ill people are not liars no matter what the Judges say.**

42. At the January 2013 summary judgment State Farm never disputed her mediation allegations but Judge Mike Miller said he did not believe a word she said. This comment, like others that showed prejudice against mentally ill people, is not in the court reporter's transcript. Halfway through the summary judgment hearing, Judge Miller, sua sponte, expressed concern that no one had considered Raizner's rights. Schramm called Raizner and the court awarded him the amount claimed. Judge Miller since retired, is now a mediator.

43. State Farm attorneys never severed the interlocutory judgement but represented two employees still in the suit. Plaintiff dismissed them leaving only defaulting parties who were agents of State Farm. The case returned the to the original court and six years ago Plaintiff was called to a bench trial and arrived with all her witnesses. All her exhibits were all admitted into evidence. As her opening statement outlined her case, showing that the defaulting parties were State Farm agents, Judge Carter stopped Plaintiff. He said as there was no other party appearing

23

Plaintiff's First Amended Complaint

he would prefer that she present her supporting witnesses by affidavit and said he would reset the hearing. That sounded reasonable. Plaintiff filed those affidavits and has waited for six years. Even as Plaintiff's case became the oldest on the docket, it continues to be passed over every time. Plaintiff made routine inquiries, but the clerk expressed undue annoyance saying Plaintiff should not ever call her about a trial setting. The case would be tried when the judge was ready.   Plaintiff wrote to the Harris County's presiding judge, but she still has not been set for trial. This Court's sua sponte no notice dismissal devastated her it because of the juxta position of these two cases is so surreal. This case has distracted her from filing a mandamus.

44.      The Texas Department of Insurance is a captive agency that considers its main objective to support the insurance companies. Just as it was unable, unwilling, and unprepared to assist Plaintiff from the fraud and criminality of State Farm, it remained uninterested in helping her when she asked them about her dispute with Community. Seven months after she filed a complaint she called and asked if they were going to respond. They said no, but they had forgotten to tell her.

**Sorry. Your Two Days to Save Your Life Expired Last Week.**

45.      Clint admits that he will not forward the information regarding her disease to his superiors. The policy gave her only two days for her physician to submit the information needed. Considering the importance of the issue two days is not commercially reasonable time frame to demand the response. Even if Plaintiff had understood that time frame give she could not be expected to comply. She had not had health care insurance for many years so there was no centralized data base with her past records. Years of traveling to other cities for work meant she had her to recreate the appointments by going through almost a decade of her credit card

24

Plaintiff's First Amended Complaint

accounts. Contacting the different physicians' offices and getting the offices to respond could not be done in within two days. Doctors had retired had "moved on" into places unknown.

46.    Navitus rigidity puts an unreasonable burden on the physician. A clerk at her physician's office had called Plaintiff and asked her to assemble what medical records she could about her psoriasis and email the information to their office. The clerk did not tell her that the drug had been disapproved, the clerk had forgotten her new email address and said that she would get back to Plaintiff with the email address but never did. Plaintiff called the physician's office three times that week but never reached the clerk nor did the clerk call her back. Physician's are routinely unable to provide proper care because their office cannot keep up with or understand insurance company rules.

47.    The onset and severity of Psoriasis is clinically proven to be linked to stress. The medical literature documents that mental health is a factor to be considered in determining the treatment of psoriasis. When Plaintiff asked Clint if the information that she was giving about the severity of her disease and its effect on her would be given to the decision makers, he said no. The refusal to reconsider the denial of a life-saving medication, when evidence relevant to the treatment decision is proffered, is bad faith.

48.    Plaintiff's recollection of the earlier portion of the call is that the Community agents told Plaintiff that they could not change the decision to deny her medication, only Navitus could. Plaintiff was not told of her statutory options such as her rights under the Step Exception program and her right to speak with a pharmacist regarding her prescription and its alternatives. As a pharmacist would have been obligated to discuss how she could find the drug at a better

25

Plaintiff's First Amended Complaint

price, she would have been told of several programs offered by the manufacturer to receive price support. In fact her income is low enough that she is qualified to receive the drug for free.

49.    Plaintiff's panic attack occurred because she believed that no matter what her legal rights were, as she was dealing with an insurance company neither the courts nor the TDI would do anything to enforce her rights. When she listened to the recording of her call she initially wondered who was that person? After listening multiple times suddenly her memories flooded back. She recalled that while on hold, waiting, she her heart was racing, she was gasping for breath, and thought that she was having a heart attack. She considered getting off the phone to call 911. She tried to stand up so she could unlock her door so that the responders could enter her home, but she collapsed on the floor. She managed to get up and open the door and then Becca got on the line. Plaintiff vaguely recalled a woman had transferred her call to Clint, but by the time the police arrived at her home she had no memory of that portion of the call.

50.    Portions of Plaintiff's conversation with Clint are not on the recording Navitus provided. The cortisol that prevented her from remembering her conversation with Becca was receding by the time the recording ended she was able to recall much of the last part of the call. The recording reveals she was calm and trying to discuss the steps available to appeal the decision by the end of the call. While she is calmly discussing her options Clint asks her if she was suicidal and she told him yes, but she immediately qualified that she was not suicidal at that moment. Her immediate qualification of that remark has been removed from the recording. The recording is unreliable. The recording has no retraction of her suicide threat. Navitus attorney told Plaintiff that the recording is complete and all of Clint's call with HPD is included. The recording of Clint's call with the police contains no statement that Plaintiff retracted her threat. However, the police report affirms that Clint told them that Plaintiff after her initial suicide

26

Plaintiff's First Amended Complaint

threat than stated that she would not commit suicide. After HPD refused Plaintiff's PIA requests for their recordings she sent them a litigation hold notice.

**No Imminent Suicide Threat to HPD**

51.    Plaintiff made no imminent suicide threat to the police. By the time they got she her panic attack was over and she was already forgetting the one she made. When the officer came to her door and asked her what was going on she answered clearly, honestly, calmly, and courteously.

> MS. MITCHELL:   I -- I have a very serious medical condition that is life-threatening. I've been in excruciating pain for eight or nine years. This medical condition has medications that has made me gain 70 or 80 pounds. No (inaudible) medication has worked, and I've had extreme complications from this medical condition -- It's psoriasis.
>
> I've had open wounds on my feet for eight to nine years, multiple open wounds that are bleeding. [redacted from transcript] and I've finally started a medication that works. It costs 3,600 a month when I make [redacted from transcript]   a year, and it's just been denied.
>
> POLICE:   Oh, your insurance (inaudible)?  Is that them on the phone now?
>
> MS. MITCHELL:   Yeah, that's them on the phone.
>
> POLICE:   Oh okay.  I mean, they're the ones that called about you.
>
> MS. MITCHELL: And I -- right.  And I said that if I can't get this -- if I can't get this, you know, why should I keep on living?  If I can't –
>
> POLICE:   (Inaudible)
>
> MS. MITCHELL:   I'm in -- well, first of all, it's killing me anyway.  [redacted from transcript]
>
> POLICE:   (Inaudible) that the insurance is not paying for your medicine –
>
> MS. MITCHELL:   Right.  And it's going to kill me
>
> POLICE:   (Inaudible).

27

Plaintiff's First Amended Complaint

MS. MITCHELL:  And you know, I said it's going to, you know -- and I live in -- when I had the open wounds on my feet, you know, because they would be -- I would get -- any time I sat or --

POLICE:  (Inaudible) because they're the ones that called me --

MS. MITCHELL:  No, no, that's okay because I

(inaudible) talking.  Because when I would -- have to go to the bathroom at night, you know, what would happen is my feet would be -- my feet would start to heal at night, so on the way to the bathroom, the fissures would break open again in excruciating pain.  So if I go to the bathroom at night, I crawl on the floor to go to the toilet because it's too painful to walk.  And this is the life I'm living.  And finally, finally I got a medication that all of a sudden, the open wounds, within three or four days of taking this medication --

POLICE: his medication was making you feel better, the one that you had

MS. MITCHELL:  It -- it worked immediately, immediately.  I no longer have open wounds that are excruciatingly painful on my feet --

POLICE:      The insurance has denied it?

MS. MITCHELL:  And the insurance has denied it

POLICE:.  So you're not suicidal.  You're just more upset that the insurance has denied your medicine –

MS. MITCHELL:  And I said that, you know –

POLICE:  (Inaudible)

MS. MITCHELL:  Right --

POLICE:  But it's not that you're suicidal or anything.

MS. MITCHELL:  Well, I will commit suicide if I can't -- if I can't get the medication, but I'm going --

POLICE:  (Inaudible).

MS. MITCHELL:  Why should I -- why should I live with excruciating pain every day of my life?

POLICE: Oh.

MS. MITCHELL: When the medication costs 3,600 a month, and I make ---- a year.

Plaintiff's First Amended Complaint

POLICE: Yeah --

MS. MITCHELL: So I can go home --

POLICE: (Inaudible)

MS. MITCHELL: But anyway, thank you so much.

I'm not going to kill myself today, but you know, I'm going to die anyway because this psoriasis is giving me heart disease.

POLICE: You're just really upset about the medicine. Right?

MS. MITCHELL: I'm really upset --

POLICE: That doesn't mean you're suicidal or anything.

MS. MITCHELL: Well, I'm not -- I'm not suicidal at this moment. I'm not going --

POLICE: (Inaudible)

MS. MITCHELL: I do. I do because I can't go back to that kind of pain. I can't go back to excruciating, daily pain.

POLICE: Right. But --

MS. MITCHELL: But I don't need to go -- I don't need to be committed.

need to be committed.

POLICE: Well, you're kind of saying that suicide

-- you're having suicidal thoughts --

MS. MITCHELL: Oh well, everybody has suicidal thoughts.

POLICE: Not -- no one says it out in the open, especially when we get called out here, due to the fact that you just said that, we have to -- and it's one thing if you're upset at the medicine --

MS. MITCHELL: Well, I'm not going to commit suicide today, if that's what you're --

POLICE: But earlier right now, you just said you were suicidal --

MS. MITCHELL: Well, yeah. I'm very -- I'm very, very upset.

POLICE: (Inaudible) medicine doesn't mean that you have to do the things that you're --

Plaintiff's First Amended Complaint

MS. MITCHELL: Well, I'm very upset. I'm so tired of living in excruciating pain. And they're saying, that's okay. You can go back because we don't want to cover. You know, it's -- you pay $7-800 a month for your insurance, but gee whiz, you know --

POLICE: Did insurance give you a reason --

MS. MITCHELL: Because they said that I should -- wasn't that -- that I need to try another, cheaper drug.

POLICE: Cheaper drug? It does sound like you've tried --

MS. MITCHELL: I've tried so many drugs. I've been to so many doctors. I've done so much, you know. This is the first medicine -- it was a miracle. It was a miracle.

POLICE: You did (inaudible) admit and say that you had suicidal thoughts earlier. You have to come with us.

MS. MITCHELL: No.

POLICE: You said it and -

MS. MITCHELL: Everybody has suicidal thoughts.

POLICE: No one tells people online and then has the company call us to come out --

MS. MITCHELL: hey want -- they want to arrest

POLICE: You're not being arrested

MS. MITCHELL: They want to involuntarily commit me. Are you there, still? Sir, are you there?

MR. CLINT: Margaret, I am here.

MS. MITCHELL: They want to take me away now because of your phone call.

MR. CLINT: Ma'am, I just want you to be safe. You did tell me --

MS. MITCHELL: No, you don't. You just -- you don't. You want to not have to pay. You want your -- you want to have your company not pay $3,600 a month so I can be healthy. That's what you want.

MR. CLINT: That is definitely not the case. I want you to be safe and well.

MS. MITCHELL: Yes, that is the case because you, you know, you wouldn't be doing this to me.

30

Plaintiff's First Amended Complaint

POLICE: No, they have policies they have to follow, like I have policies I have to follow.

MS. MITCHELL: Okay. Well, excuse me, I'm going 'm going to go --

POLICE: Ma'am -

MS. MITCHELL: I'm going to shut the door and put the dog in, make sure the --

POLICE: Do you have -- do you live by yourself?

MS. MITCHELL: I live by myself.

POLICE:      Do you have anyone that can come take care of the dogs?

MS. MITCHELL: I'll call somebody.

POLICE: All right.

MS. MITCHELL: I'm going to get -- I'm going to get my purse.[15]

52.     This exchange lacks probable cause. Plaintiff was calm and courteous to the officer. She did not curse, berate, or threaten anyone. There is no mental illness and no imminence. Being extremely but understandably upset is not proof of mental illness under the Mental Health Code mental illness "substantially impairs a person's thought, perception of reality, emotional process, or judgment; or (2) grossly impairs behavior as demonstrated by recent disturbed behavior."[16] As the examining psychiatrist told Plaintiff, it was very natural for anyone in her situation to be thinking about these things. The suicidal thoughts she was experiencing did not spring from mental illness, they were a direct and normal response to physical illness. Having suicidal thoughts are not sufficient to establish mental illness.

---

[15] Document 6-1 Exhibit A to Navitus Motion to Dismiss Plaintiff's Original Petition at 44.
[16] *Cantrell v. City of Murphy,* 666 F.3d 911 (Cir. 2012), *citing* H. & S. Code § 571.003.

31

Plaintiff's First Amended Complaint

53.    There was no imminence. As Plaintiff told the officer the medication was working, and she was not experiencing the pain and disability.  But the officer states: "you had suicidal thoughts earlier.  You have to come with us."  The officer repeat is that it is because she has suicidal thoughts and that she openly communicates these thoughts that she must come in.

> MS. MITCHELL:  Oh well, everybody has suicidal thoughts.
>
> POLICE:  Not -- no one says it out in the open, especially when we get called out here, due to the fact that you just said that, we have to -- and it's one thing if you're upset at the medicine –
>
> . . . . . .
>
> No one tells people online and then has the company call us to come out.[17]

**Patients MUST be allowed to speak to their health care Gate keepers regarding suicidal ideation without fear of torture.**

54.    Plaintiff's remarks were not "Out in the open" in some random chat room "online." Plaintiff called her health insurance company. These are the people whom the laws establishes are the only people in the world who have been have vested with the power of life and death over Plaintiff in this circumstance. The most appropriate entity to be told that the withholding of the drug causes suicidal ideation is the entity which withholds the drug. Plaintiff has a First Amendment right to communicate this information to these people. The standard the officer used in this situation violates every patients' privilege to speak freely to their  healthcare providers and gatekeepers. Furthermore, a properly trained officer would have a protocol would have known that in this type of high stress situation situation a panic attack. It is not in

---

[17] Document 6-1 Exhibit A to Navitus Motion to Dismiss Plaintiff's Original Petition at -

Plaintiff's First Amended Complaint

this transcript, but Plaintiff remembers that he told her she would only be gone a day or two. He may have been incorrectly "err[ing] on the side of caution"[18]

55.    Involuntary commitment requires evidence of a "substantially deteriorating ... ability to function independently, exhibited by [an] inability to provide for ... basic needs, including food, clothing, health, or safety."[19] Plaintiff is independent and high functioning. She was gainfully employed living in a reasonably well maintained house with a dog and a cat. This standard was not considered.

56.    Not only did Plaintiff not meet the standard for mental illness but there was no evidence of a substantial risk of serious harm to Plaintiff or to others "unless she was immediately restrained and there was no time to obtain a warrant."[20] The officer realized there was no need to restrain Plaintiff. Following the City of Houston's official policy, the officer shackled her. Plaintiff is elderly and disabled. Her right wrist was in a medical brace because she broke two

---

[18] *Responding to the Mentally Ill: A Guide for Texas Peace Officers,* Houston Police Department, Revised May 2018

[19] *In the best Interest and Protections of R.J.R.,* No. 06-13-00054-CV (Ct App.—Texarkana July 3, 2013), citing H. & S. Code § 574.034(a)(2)(C)(ii).The T*exas Mental Health and Intellectual and Developmental Disabilities Law Bench Book,* The Judicial Commission on Mental Health (October 2018) identifies the common signs as:
 Malnutrition
 Poor hygiene arising to a level of dangerousness
 An inability to administer necessary medications
 Failure to provide for adequate shelter
 Failure to maintain their own safety
 Disorientation
 Delusional thinking
 Responding to visual and auditory hallucinations
 Responding to an officer's questions with grunting noises
 Soiling one's self regularly
*Id.* at 2 *Citing, In re A.T.,* No. 02-18-00197-CV, 2018 WL 3385701 (Tex. App.—Fort Worth July 12, 2018, no pet.); *State for Best Interest & Prot. of H.S.,* 484 S.W.3d 546, 551 (Tex. App.— Texarkana 2016, no pet.); *In re M.R.,* No. 02-15-00221-CV, 2015 WL 6759249 (Tex. App.—Fort Worth Nov. 3, 2015, no pet.).
[20] *Cantrell v. City of Murphy,* 666 F.3d 911 (Cir. 2012), *citing* H. & S. Code § 571.001.

Plaintiff's First Amended Complaint

bones in her hand when she rescued her puggle from a pit bull attack. Aware that restraints were unnecessary he called his superiors to see if he could get an exception. The officer apologized to Plaintiff when his superiors directed him to shackle her.

57.     From the moment the officer arrived she was compliant; there was never any need to secure the scene; the requirements of *Hainze*[21] were satisfied and the police were required to comply with the ADA. Plaintiff continually asked, that the cuffs be removed. The failure to do so violated Section 504 of the Rehabilitation Act[22] because she was denied accommodation of her physical disabilities on the basis of perceived mental disabilities.

58.     HPD General Order 200-19, that implements Americans with Disabilities Act, is without guidance on using restraints on people with broken bones, severe arthritis, and extensive nerve damage. The six hours of cuffing was a clear violation of the ADA. Once she was admitted to the hospital it was outrageous that she remained shackled for the sole purpose of an overtime scam. The officer chained her to a bed and then left for over two hours.

**A mentally ill person is not, by Default, a Violent and Dangerous Criminal.**

59.     The HPD Transportation Policy puts section 573 classifies detainees the same as violent prisoners. "When transporting a violent prisoner or a person exhibiting signs of being in a mental health crisis, officers shall use approved restraints to ensure their safety and that of the person, remaining mindful that persons in crises can be very unpredictable." General Order No. 500-02 (3) Handling and Transporting Prisoners and Other Persons. This joinder is disturbing and reflects the mindset characterizing the mentally ill as a species of criminal. This policy violates the very tenants the Texas Health Code establishes. Instead of  eliminating "the

---

[21] Hainze v. Richards, 207 F.3d 795, 801 (5th Cir. 2000).
[22] 29 U.S.C. § 794(a).

34

Plaintiff's First Amended Complaint

traumatic effect on the person's mental health [from] criminal-like procedures"[23] it actively traumatizes and criminalizes detainees. By violating the ADA it fails to safeguard legal rights and "impede[s] the therapeutic and protective purposes of involuntary care."[24] This detention and its aftermath devastated Plaintiff.

**Where is the Judge?**

60.    When she got to the NPC she did not consent to examination and asked, the first of many times, to speak to a judge. "The probate judge or magistrate shall be available at all times at the request of a person apprehended or detained under Chapter 573 . . .."[25] "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."[26] She was told at both NPC and BTEC, that she had no right to see a judge. When she brought this failure to comply with Health and Safety Code section 571.012 to the attention of facilities administration and compliance officers, she received a letter telling her that it was the policy of Harris Health to deny detainees this statutory right to see a judge. As she is an attorney this failure denied her procedural due process and her Sixth Amendment right to counsel.[27]

---

[23] H. & S. Code § 571.002(3).

[24] H. & S. Code § 571.002(7).

[25] H & S Code § 571.012. See also H & S Code § 571.002 (The purpose of the Mental Health Code includes "protecting the person's right to a judicial determination of the person's need for involuntary treatment."); 25 Tex. Admin. Code § 404.155 ("The right to communicate with legal counsel, the department, the courts, or the state attorney general may not be restricted.").

[26] Addington v. Texas, 441 U.S. 418, 425 (1979); see also Bounds v. Smith, 430 U.S. 817 (1977) (holding that right of access to the courts is fundamental).

[27] "If a State court has not adjudged a client incompetent, any legal representative designated by the client in accordance with State law may exercise the client's rights to the extent allowed under State law." 42 CFR § 485.910. "The provision of court-ordered, emergency, or voluntary mental health services to a person is not a determination or adjudication of mental incompetency and does not limit the person's rights as a citizen, or the person's property rights or legal capacity." H & S Code § 576.002.

Plaintiff's First Amended Complaint

61.     Once arrived at NPC she was never informed of her right to seek other counsel nor given any "opportunity to communicate with and retain an attorney."[28] was never "advised that communications with a mental health professional may be used in proceedings for further detention."[29]

62.     She was never informed of her statutory rights.[30] In fact, when she was at NPC, humiliatingly and painfully shackled to the furniture, she was told by the individual examining her that she would never be allowed to see a judge or have further communication with anybody and she would remain painfully shackled until the facility had subjected her to whatever it planned to subject her to.[31] This was the total extent of information concerning the scope or purpose of the exam she was given. she was incredulous and asked about the time frame of this proposed involuntary, painfully shackled,[32] incognito detention. The nature and extent of this

---

[28] H & S Code § 573.025(a)(2)

[29] H & S Code § 573.025(a)(5).

[30] H & S Code § 573.025 ("A person apprehended, detained, or transported for emergency detention under this subtitle shall be informed of the rights provided by this section and this subtitle . . ..").

[31] "During the initial evaluation, the CMHC must provide the client, the client's representative (if appropriate) or surrogate with verbal and written notice of the client's rights and responsibilities." 42 CFR § 485.910(a)(1). "Community mental health center (CMHC) means an entity that . . . 4) Provides screening for patients being considered for admission to State mental health facilities to determine the appropriateness of this admission." 42 CFR § 410.2; H & S Code § 573.025.

[32] "All clients have the right to be free from restraint or seclusion, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff. Restraint or seclusion, defined in 42 CFR § 485.902, may only be imposed to ensure the immediate physical safety of the client, staff, or other individuals." 42 CFR § 485.910(e)(1). H & S Code § 576.024 states:
   (a) A physical restraint may not be applied to a patient unless a physician prescribes the restraint.
   (b) A physical restraint shall be removed as soon as possible.
   (c) Each use of a physical restraint and the reason for the use shall be made a part of the patient's clinical record."

36

Plaintiff's First Amended Complaint

examination was never told to her, not even later at BTEC. she was told at NPC it would last indefinitely without recourse. This was abusive.[33]

63.    When she was delivered to NPC, no Notice of Detention was filed and she was not given the Notice of Detention.[34]  This violates the statutory directive that "[t]he facility where the person is detained shall include in the detained person's clinical file the notification of detention described by this section."[35]  she have been told not only is there no Notice of Detention, but there is no memorandum of understanding executed in compliance with Section 573.005 to account for the use of the Houston Police Department to transfer detainees after arrival at the NPC.

**Officer Remains for Testing**

64.    When she was taken to NPC the only remaining duty of the officer was to file the Notice of Detention, when filed, the obligations of the peace officer were fulfilled and she was in

---

[33]  "'[A]buse' includes coercive or restrictive actions that are illegal or not justified by the patient's condition . . .."
H & S Code § 161.132(j).  Tex. Admin. Code 25 Rule 441.101(1) defines abuse as

> An intentional, knowing, or reckless act or omission by provider personnel, a counselor, applicant for counselor licensure, or counselor intern that causes or may cause death, emotional harm or physical injury to a participant or client. Abuse includes without limitation the following:
>> . . . . . .
>> (D) efforts to cause fear;
>> (E) the use of any form of communication to threaten, curse, shame, or degrade a participant or client;
>> (F) restraint that does not conform with chapter 148 of this title (relating to Standard of Care);
>> (G) coercive or restrictive actions taken in response to a participant or client's request for discharge or refusal of medication or treatment that are illegal or not justified by the participant or client's condition . . ..

[34]  "A peace officer who transfers a person to emergency medical services personnel under a memorandum of understanding executed under this section for transport to the appropriate facility must provide: (1) to the person the notice described by Section 573.001(g)." H & S Code § 573.005(e).
[35]  H & S Code § 573.002(c).

Plaintiff's First Amended Complaint

custody of the designated facility. "[C]hapter 573 contains no grant of authority allowing an inpatient mental health facility or mental health facility to reject a person transported by a peace officer under chapter 573 for lack of a medical evaluation and clearance."[36] Although, as the body camera footage of the officer will no doubt show, she was calm, compliant, reasonable and appropriate, the officer lingered after her delivery and acceptance by NPC. She remained in shackles as the officer remained to witness her custodial interrogation by NPC.[37]

**Transfer for Medical Reasons**

65.    After she agreed to submit to testing and examination NPC asked for her medical history, took blood, and checked her vitals. As soon as her vitals were taken the questioning stopped and everyone left the room. The woman who had informed her she would remain shackled to the furniture forever, and without legal recourse, returned and told her she was too sick to stay there. She stated the NPC was only a psychiatric hospital and lacked the facilities a person as ill as she needed. she was never told what the criteria were for this need of transport. All relevant medical records pertaining to her stay at NPC were shredded. "A medical record must be maintained for every individual evaluated or treated in the hospital."[38] The medical records of BTEC have scant incidental mentions of her transport, but not in the form

---

[36] Attorney General Opinion GA-0753.

[37] All clients have the right to be free from restraint or seclusion, of any form, imposed as a means of coercion, discipline, convenience, or retaliation by staff. Restraint or seclusion, defined in 42 CFR § 485.902, may only be imposed to ensure the immediate physical safety of the client, staff, or other individuals. 42 CFR § 485.910(e).
Such a situation turns the exam into a custodial interrogation. *Coffey v. State*, 435 S.W.3d 834, 841 (Tex.App.–Texarkana 2014, pet. ref'd).

[38] 42 CFR § 482.24.

38

Plaintiff's First Amended Complaint

prescribed by law. she have the "right to an explanation of the justification of any transfer."[39] she has never received this explanation.

**No Restrictions on Restraints**

66. Upon accepting her for evaluation NPC was required to review the use of restraints. In order to continue the use of restraints they must be prescribed by a physician. Rules adopted by the Texas Health and Human Services Commission for facilities treating individuals detained under section 573 must:

> (1) authorize a registered nurse . . . trained to assess medical and psychiatric stability with demonstrated competence as required by rule to conduct a face-to-face evaluation of a patient . . . not later than one hour after the time the use of restraint or seclusion is initiate; and
>
> (2) require a physician to conduct a face-to-face evaluation of a patient . . . and document clinical justification for continuing the restraint . . ..[40]

67. These rules were not followed by NPC. Furthermore, had restraints been warranted, the criminal handcuffs were not allowed. "Despite their commercial availability, the following types of devices may not be used to implement restraint: (i) those with metal wrist or ankle cuffs . . .."[41]

---

[39] Tex. Admin. Code Title 25 § 404.154 (13).
[40] H & S Code § 322.001.
[41] Tex. Admin. Code Title 25 Rule § 441.101(75).

Plaintiff's First Amended Complaint

68.     Using HPD to transport detainees may have been perceived as a convenient cost cutting stratagem, as it avoids the expenses imposed by EMTALA,[42] but it is a cost-shifting mechanism. It shifts the costs from the facility to the detainee injured by the deviation from the standard of care. It deliberately denies potentially life-saving medical treatment to shackled, non-criminal, disabled mental health detainees. We know that this is true because that is the standard used to determine the necessity of transport.

69.     To hide this malfeasance the facilities intentionally destroy and falsify detainees' medical records. True costs remain hidden. Plaintiff now experiences painful debilitating hand injuries. It may be that she had multiple undetectable micro strokes, which accelerate dementia, that could have been minimized had the proper protocol for a hypertensive crisis been implemented. These destroyed records can be exculpatory; Plaintiff's contain direct evidence indicating the behavior initiating her involuntarily detention sprang from a specific medical condition, not mental illness. Her misdiagnosis was beyond malpractice, it was not negligent, it was deliberate.

70.     The facility's policy meant that the physician was effectively forbidden to give a correct diagnosis; a correct diagnosis would reveal the criminal conspiracy. Plaintiff's physicians later admitted their initial assessment was incorrect by a factor of fifty percent. This examining physicians' participation in a criminal enterprise not only consciously limits

---

[42] The Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd. The Texas equivalent to EMTALA is contained in Texas Health and Safety Code Section 241.027 (b). As a person harmed by the failure to comply with medically correct transfer protocols Mitchell is afforded the right to sue for injunctive relief and common law damages. Texas Health and Safety Code Section 241.056.

Plaintiff's First Amended Complaint

probable diagnosis favorable to the detainee but creates a psychological pressure to diminish the intrinsic value of the detainee making it easier to discriminate and find against them. This reflects a fundamental assumption that both the physically and mentally disabled are not worthy of full consideration. It creates doubt about the validity of every detainee's assessment. The physician may reach the correct outcome, they did let Plaintiff go, but that is insufficient. The physician's assessment alone determines whether or not a person will be held and processed for commitment.[43] Participation in this illegal scheme creates a direct and impermissible conflict of interest.[44] The opinions of those who participated in this scheme are legally incompetent.

71.    Governor Abbott opined as Attorney General "chapter 573 contains no grant of authority allowing an inpatient mental health facility or mental health facility to reject a person transported by a peace officer under chapter 573 for lack of a medical evaluation and clearance. . . . [A]n inpatient mental health facility or a mental health facility is not statutorily authorized to require a peace officer to transport a person in custody under chapter 573 to a medical facility for a medical evaluation."[45]  Delegating a duty "does not relieve the  . . . facility administrator from responsibility."[46]   Any transport from NPC must be accomplished in a medically

---

[43] H&S Code §573.022 (a)(2)

[44] The defendants convicted by the testimony of Officer Goines, whose cases are being reexamined after the Houston Police Department's no-knock debacle "are entitled to a presumption that he provided false evidence *see https://app.dao.hctx.net/district-attorney-kim-ogg-69-defendants-may-have-been-convicted-false-evidence-presented-former-hpd*

[45] Texas Attorney General Opinion GA-2011.

[46] H & S Code § 571.007(c).

41

Plaintiff's First Amended Complaint

appropriate manner.[47] "No transfer can be made unless a physician authorizes and provides records ensuring that the transfer is appropriate for the patient's needs." [48]

### Tortious Transportation

72.    Plaintiff was then taken by the original officer, still in cuffs, to Ben Taub Emergency Center. The officer stayed with her for some time until he saw relieved by another gentleman, allegedly attached to the fire department. They seemed well acquainted as they jokingly discussed that detentions like hers were easy overtime. Her request for the cuffs to be removed was denied. Just like the transfer of custody from NPC to the police officer, this further transfer is not reflected in the medical records. As a woman she had the right to be "transported or accompanied by a female attendant."[49]

73.    "A patient receiving mental health services . . . has the right to . . . a humane treatment environment that provides reasonable protection from harm."[50]  A "departure from accepted

---

[47] H & S Code § 241.028(c)(1). "The rules must provide that patient transfers between hospitals be accomplished through hospital policies that result in medically appropriate transfers from physician to physician and from hospital to hospital." H & S Code § 241.027(b). *See also* The Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd (EMTALA). HPDs Policy document *Responding to the Mentally Ill: A Guide for Texas Peace Officers*, Houston Police Department Revised May 2018 recognizes this:

> Once the person is taken to the hospital, federal EMTALA law requires the hospital to arrange for appropriate transfer, when necessary. EMTALA preempts any state law with which it is in conflict. EMTALA requires that a hospital accept any person who presents or is brought to the emergency room for the purpose of per- forming a medical screening. If the ED staff determine the person has an emergency medical condition (including psychiatric and substance abuse emergencies), the hospital is then responsible for the person until the emergency has been stabilized, including the person's discharge or transfer from the hospital to another facility that has the capability and capacity to manage the per-son's condition.

*Id.* at 39-40.
[48] Rule 133.44 Hospital Patient Transfer Policy.
[49] H & S Code § 576.021(5).
[50] H & S Code § 576.021(5).

42

Plaintiff's First Amended Complaint

standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to . . . a claimant" is the basis for liability.[51]   Due process demands that the statutory scheme be followed. Temporary detention in an involuntary commitment proceeding does not allow for undocumented interagency transfer of custodial jurisdiction once the detainee has been taken to the statutorily mandated mental health facility.[52]

74.     There was an improper use of a police vehicle to transfer Plaintiff. Transporting patients, who are not under arrest, between medical facilities is not a "method of providing police or fire protection."[53] It was not equipped with an operator who would comply with medical standards. If she had remained at NPC they would have had to evaluate her and take off the cuffs. If she had been transported in a vehicle with an individual trained to follow medical protocols the use of cuffs would have to have been medically assessed and documented prior to transport.

75.     The Texas Tort Claims Act waives sovereign immunity when the wrongful act, omission, or negligence of a governmental employee, acting within his scope of employment, causes personal injury arising from the use of a motor-driven vehicle where the employee would be personally liable to the claimant according to Texas law; and the governmental unit would

---

[51] Civ. Prac. & Rem Code § 74.001(a)(13)
[52] Section 573.005 allows an officer to transfer the detainee to emergency medical services personnel pursuant to a memorandum of understanding but these are not cumulative options, the choices are disjunctive. "[H]ospitals have some level of responsibility for their patients . . . the Mental Health Code [intends] to facilitate treatment for mentally ill patients in an appropriate setting. " Texas Attorney General Opinion No. GA-2011.
[53] Tex. Civ. Prac. & Rem. Code § 101.055(3).

43

Plaintiff's First Amended Complaint

be liable for personal injury caused by the use of motor-driven vehicle if the, were it a private person, be liable to the claimant according to Texas law.[54]

76.     The policy of HPD to transport detainees once jurisdiction over the person has passed to the facility is a wrongful policy. By failing to train the officer to follow the law, Houston has failed to adequately train for the tasks the officers must perform. A municipality is liable when "the deficiency in training actually caused the police officers' indifference to [ her ] medical needs."[55] Plaintiff had a right to receive all services according to the acceptable standard of care.[56]

77.     The conditions of treatment for detainees under civil commitment statutes is determined by the substantive due process clause of the Fourteenth Amendment.[57]  However, an excessive force claim is "brought under the Fourth Amendment."[58]  "The 'reasonableness' of a particular

---

[54] *See, e.g., Columbia Valley Healthcare Sys. v. Zamarripa*, 526 S.W.3d 453 (Tex. 2017)(conditions of transportation between hospitals by ambulance could form the basis for cause in fact for the deviation from the standard of care providing basis for negligence claim).

[55] *City of Canton v. Harris*, 489 U.S. 378, ___ (1989).

[56] *See* 25 Tex. Admin. Code § 448.203:.

> Providers shall plan, supervise adequately, and evaluate any activity for which they are responsible. Providers shall render services carefully and promptly. Providers shall follow the technical and ethical standards related to the provision of services, strive continually to improve personal competence and quality of service delivery, and discharge their professional responsibility to the best of their abilities. Providers are responsible for assessing the adequacy of their own competence for the responsibility to be assumed. Services shall be designed and administered as to do no harm to recipients. The provider shall always act in the best interest of the individual being served. The provider shall terminate any professional relationship that is not beneficial, or is in any way detrimental, to the individual being served.

[57] *Youngberg*, 457 U.S. at 321-22.

[58] *Green v. City of Mission*, Civil Action 7:18-CV-00049 (S.D. Tex. 2018), *citing Graham v. Connor,* 490 U.S. 386, 393-94 (U.S. 1989)("*all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").

44

Plaintiff's First Amended Complaint

use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[59]

78.    The officer who originally detained her called his supervisor said he did not want to cuff Plaintiff. "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."[60] "[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety.'"[61] This standard of care is higher than the standards which apply to voluntary patients.[62] HPD and Harris Health had an affirmative obligation to reasonably accommodate her arthritis, long term nerve and muscle damage, and broken bones in her hand. This failure violated the ADA[63].

**Feeling the Pressure**

79.    Immediately upon arrival at Ben Taub Plaintiff was put on a blood pressure monitor. The vitals of a second detainee, brought to the Ben Taub Emergency Room intake window by another agency, did not have his vitals monitored. They continuously monitored her blood pressure. she looked at the reading on the machine and it registered "238" and "160."[64] she was

---

[59] *Graham v. Connor,* 490 U.S. 386, 396, (1989)(citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)).
[60] *Id.*
[61] *DeShaney v. Winnebago Cnty Dep't of Soc. Servs.,* 489 U.S. 189, 194 (1989).
[62] *Mills v. Rogers,* 457 U.S. 291 (1982).
[63] 42 U.S.C. § § 12131, 12132; *Bennett-Nelson v. La. Bd. of Regents,* 431 F.3d 448, 454 & n.11 (5th Cir. 2005*) Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio,* 633 Fed.Appx. 214, 215 (5th Cir. 2015); *Ball v. LeBlanc,* 792 F.3d 584, 596 n.9 (5th Cir. 2015).
[64] H & S Code § 573.022(a)(The "facility shall provide adequate medical and psychiatric care and treatment to every patient in accordance with the highest standards accepted in medical practice."). *See also* https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/expert-answers/anxiety/faq-20058549 ("Anxiety doesn't cause long-term high blood pressure (hypertension). But episodes of anxiety can cause dramatic, temporary spikes in your blood pressure.");

45

Plaintiff's First Amended Complaint

not told what this reading meant; it was never discussed. That reading meant that plaintiff was in hypertensive crisis and could have been at of major stroke or death, yet she was offered no treatment. Involuntary detainees have the "right to be free from severe psychological abuse and emotional trauma—both of which are often inextricably related to some form of physical mistreatment."[65] In "a deliberate indifference claim pursuant to the Fourteenth Amendment's Due Process Clause . . . the official must . . . know of and disregard a substantial risk of harm." "[T]he deliberately indifferent state of mind can be inferred 'from the fact that the risk of harm is obvious.'"[66] The fact that her hypertensive crisis was never put in the medical records and that the BTEC said that she arrived from a non-medical source of origin traumatized her

80.    Plaintiff continually requested removal of the restraints stating that they hurt. The other detainee, a young fit man apparently being detained for making death threats against his wife, was not restrained. The lady monitoring her vitals stated that was because the law enforcement agency had different detention policies than HPD and that the hospital had to allow HPD to follow their policies during her detention. When BTEC "admitted" her the medical records state her blood pressure was 176 over 70. When she requested the record of her vitals before

---

https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/expert-answers/hypertensive-crisis/faq-20058491 ("A hypertensive crisis is a severe increase in blood pressure that can lead to a stroke. Extremely high blood pressure — a top number (systolic pressure) of 180 millimeters of mercury (mm Hg) or higher or a bottom number (diastolic pressure) of 120 mm Hg or higher — can damage blood vessels. The blood vessels become inflamed and may leak fluid or blood. As a result, the heart may not be able to pump blood effectively.").

[65] *M.D. v. Abbott*, 907 F.3d 237, 250 (5th Cir. 2018), *Citing DeShaney*, 489 U.S. at 200; *Youngberg,* 457 U.S. at 317.

[66]  907 F.3d at 253 *quoting Hope v. Pelzer*, 536 U.S. 730, 737 (2002).

46

Plaintiff's First Amended Complaint

"admittance," she was told it was hospital policy not to keep records generated prior to "admission."[67]

81.     When Plaintiff was "admitted" to the BTEC, again no one informed her of her rights, including the minimal disclosures mandated by statute.[68] Again she requested to see a judge, and once again this was denied on the basis of Harris Health's policy. she was not informed of her right to counsel nor that her statements could be used against her in a court of law. she was given no paperwork of any type. she signed no paperwork nor gave anyone the name of,

---

[67] Patient transfers must provide "for the transfer of all necessary records." Tex. H & S Code § 241.027(b)(4). "Providers shall not falsify, alter, destroy or omit significant information from required reports and records or interfere with their preservation." 25 Tex. Admin Code § 448.217. ("The hospital must maintain a medical record for [that] must be accurately written, promptly completed, properly filed and retained, and accessible . . . [with] a system of author identification and record maintenance that ensures the integrity of the authentication and protects the security of all record entries.").

[68]  & S Code § 321.002(f) ("Before a facility may admit a patient for inpatient mental health . . . the facility shall provide to the person . . . a written copy of the applicable 'bill of rights' adopted under this section."); H & S Code § 576.010. Additionally all section 573 detainees must be told: .

A person apprehended, detained, or transported for emergency detention under this chapter has the right:

(1) to be advised of the location of detention, the reasons for the detention, and the fact that the detention could result in a longer period of involuntary commitment;

(2) to a reasonable opportunity to communicate with and retain an attorney;

(3) to be transported to a location as provided by Section 573.024 if the person is not admitted for emergency detention, unless the person is arrested or objects;

(4) to be released from a facility as provided by Section 573.023;

(5) to be advised that communications with a mental health professional may be used in proceedings for further detention;

(6) to be transported in accordance with Sections 573.026 and 574.045, if the person is detained under Section 573.022 or transported under an order of protective custody under Section 574.023; and

(7) to a reasonable opportunity to communicate with a relative or other responsible person who has a proper interest in the person's welfare.

H & S Code § 573.025(a); see also, 25 Tex. Admin. Code § 404.158(1).

Plaintiff's First Amended Complaint

or information concerning her insurance company. she was never told the Harris Health thought that it could bill me. she was not told of her HIPAA rights or state law rights regarding her medical records. she was not told of her right to be transported after detention. her purse and phone were again taken from her and the contents searched. Harris Health wished to do invasive medical testing procedures as part of her examination, but unlike at NPC where a police officer with a gun was enforcing her compliance with medical testing procedures, she dared to refuse.

**Warrantless Search of her Medical Records**

82.     When she received copies of the records of the examination it was noted that her past medical records had been reviewed. she gave no consent, there was no warrant, there was no allegation of a vehicle related intoxication crime, she was not receiving treatment, nor were any HIPAA warrantless exceptions present.[69]

83.     It did not take long for the physician and BTEC medical personal to determine Plaintiff did not meet the criteria for commitment, and she was released. They failed to provide her transport home.[70] When she asked how she was to get home the security officer she was told to call someone. As her battery had died while she was detained the guard dialed a taxi for her and allowed her to speak to the dispatcher. It took her almost two hours from the time that Harris Health states she was allegedly released until she could leave. Even after she informed Harris Health that they were required to arrange for her transport, they did not offer to

---

[69] 45 C.F.R. § 164.512(f).
[70] "If the person was apprehended by a peace officer under Subchapter A, arrangements must be made to immediately transport the person." H & S § 573.034(c).

48

Plaintiff's First Amended Complaint

reimburse her wrongfully stating that allowing her to speak to the cab company on their phone fulfilled their statutory duty of transport.[71]

84.    When she returned home she was in great physical pain from the hours of having her injured arm shackled.[72] The cruelty and deliberate indifference, the good humored banter that she was "easy overtime" while she endured physical suffering inflicted solely because she is disabled, shocked here. That the unwarranted intrusion was incredibly stressful s demonstrated by her dangerous blood pressure levels. She had never had an issue with her blood pressure and did not know that when blood pressure reaches 180 or above she was in immediate peril of death or stroke. When her blood pressure spiked Harris Health did not inform her or threat the condition. They prudently monitored it. BTEC did not "admit" her until the reading was at a level no longer considered life threatening.

85.    It was weeks, even months, in some instances before she could tell people about this detainment. Those close to her were concerned that she would relapse into a major depression. she had extreme and persistent suicidal ideation in the months following her detention. It was not until she decided to confront these institutions that she regained her emotional health.

**Illegal Bill**

86.    Within ten days after she returned home, she received a bill for $1,275.00. The pending insurance payment was $762.90, her portion was $512.10. She had never signed any document informing them who her carrier was or giving them permission to contact her insurance

---

[71] "The county in which the person was apprehended shall pay the costs of transporting the person." H & S § 573.034 (d)(emphasis added).

[72] I may not have shown this pain at the hospital because I have lived for decades with debilitating pain. However, because I dislike the way pain medication makes me feel, and they prevent me from being functional, twenty years ago I decided not to take them for my chronic pain.

49

Plaintiff's First Amended Complaint

company. She had not been told about any potential bill when she was detained.[73] She was not presented the bill prior to it being sent to Community. She immediately disputed the bill.

87.   Under the Texas Administrative Code when a physician finishes the preliminary examination of the section 573 detainee the physician may, if the criteria for detention are met, prepare a detailed written statement documenting in the determination  and issue an order of admission.[74] If the criteria are not met, the "hospital shall release a prospective patient."[75] Only when the detainee is admitted does the hospital "conduct an intake process [that shall include obtaining] relevant information about the patient, including information about finances [and] insurance benefits."[76]

88.   Health and Safety Section 571.018 controls the payment of "costs" in all involuntary commitment proceedings. "The costs shall be billed by the clerk of the court conducting the hearings."[77] "The costs for a hearing or proceeding under this subtitle shall be paid by: (1) the county in which emergency detention procedures are initiated under Subchapter A or B, Chapter 573." [78] "The responsible county is required to pay the costs of all mental health services proceedings relating to a proposed patient that are provided for under chapters 571 through 577 of the Health and Safety Code until that person is discharged. The costs of mental health services proceedings payable by the responsible county include, but are not limited to, those enumerated in section 571.018(c)."[79]

---

[73] H & S Code § 311.002(c)
[74] 25 Tex. Admin. Code § 411.462(c).
[75] 25 Tex. Admin. Code § 411.462(d)(1).
[76] 25 Tex. Admin. Code § 411.462(e)(1).
[77] H & S Code § 571.018(c).
[78] H & S Code § 571.018(d).
[79] Attorney General Opinion No. JC-0287. "The responsible county is required to pay the costs of all mental health services proceedings relating to a proposed patient that are provided for under chapters 571 through 577 of the Health and Safety Code until that person is discharged. . .. The

50

Plaintiff's First Amended Complaint

89.     When a detainee is released after the examination of the physician because the criteria of commitment cannot be met, there is no hearing. Without a hearing, the clerk of the court does not create a bill of costs. Thus although "A county is entitled to reimbursement for costs actually paid by the county from: (1) the patient; or (2) a person or estate liable for the patient's support," to collect from the patient there has to be a bill of costs prepared by the clerk. Section 573A detainees who are released without treatment owe no money under the statutory scheme. This payment scheme is further controlled by Local Government Code Section 118.055(c) which controls "[t]he fee for an action involving mental health or chemical dependency services is for the services listed in Sections 571.016, 571.017, 571.018, and 574.008(c), Health and Safety Code." "Except as otherwise provided, the fees listed in this section are total fees."[80] "An officer who, in good faith, demands and receives a higher fee than authorized or a fee not authorized under this chapter is liable to the aggrieved person for the difference between the amount demanded and received and the amount of the fee authorized under this chapter."[81]

90.     By billing these matters Harris Health is taking sensitive mental health PHI[82] protected by Health and Safety Code Sections 181 and 611 and putting it into the patient's insurance company's hands where it will become a permanent part of their "private" insurance record. It then becomes subject to the vagaries of has already in this instance been shown to be unreliable

---

costs of mental health services proceedings payable by the responsible county include, but are not limited to, those enumerated in section 571.018(c)." Attorney General Opinion No. JC-0287. *See also* Attorney General Opinion No. JM-1234 ("the county itself is responsible for the costs of services of the clerk.").

[80] Local Gov't Code § 118.055(d)

[81] Local Gov't Code § 118.801(b)

[82] It is "'indisputable' that commitment to the mental hospital alone could cause 'adverse social consequences to the individual' and stated that '[w]hether we label this phenomena 'stigma' or choose to call it something else[,] we recognize that it can occur and that it can have a very significant impact on the individual.'" *Coleman v. Dretke,* 409 F.3d 665, 667 (5th Cir. 2005), *quoting Vitek v. Jones,* 445 U.S. 480, 492 (1980).

51

Plaintiff's First Amended Complaint

institutions. Once an insurance company has received a bill for covered services, they have an absolute right to see the medical records. However, medical records of an involuntary mental health detention may only be released pursuant to an express statutory right or court order. Mental Health Records underlying a commitment hearing are granted an extraordinary degree of confidentiality.[83] Law enforcement may only access these records in execution of a writ to a warrant.[84]

91. Harris County says that it can enter into third party agreements that contravene the statute.

> When patients present to the Ben Taub Emergency Center, it is Harris Health's practice to use the demographic information provided by patients (e.g., name, date of birth, etc.), to search national databases that identify the patients' insurance carrier, if any, for individuals. In your case, Harris Health utilized one of these databases and determined that Community Health Choice is your insurance carrier. Harris Health has a provider services' agreement with Community Health Choice. Pursuant to that agreement, Harris Health agrees to provide covered services to all Community Health Choice members and Community Health Choice agrees to pay Harris Health for all claims submitted by Harris Health for covered services provided to Community Health Choice's members. "Emergency services," are a covered service. Based on the forgoing, Harris Health billed Community Health Choice for the emergency services provided to you because you did not affirmatively state that you wanted to be classified as a "self-pay" patient and because Harris Health's agreement with

---

[83] H & S Code § 756.005; 25 Tex. Admin. Code § 404.154(21)("The right to confidentiality of records and the right to be informed of the conditions under which information can be disclosed without the individual's consent. At department facilities and community centers, client-identifying information shall be disclosed in accordance with Chapter 403, Subchapter K of this title (relating to Client-Identifying Information). At psychiatric hospitals, client-identifying information shall be disclosed in accordance with the provisions of the Texas Health and Safety Code, §§ 576.005 and 611.001-611.005, and 42 Code of Federal Regulations, Part 2.").
[84] H & S Code § 751.015(e).

Plaintiff's First Amended Complaint

Community Health Choice authorizes Harris Health to bill Community Health choice for these covered services.[85]

Since released detainees have no obligation to pay Harris County cannot impose an obligation by calling the detention emergency services.

92.    The Insurance Defendants did not offer reasonable procedures in their denial of Otezla. .Plaintiff was not advised of her rights under Insurance Code Section 1369.0546, the Step Therapy Protocol Exception. Plaintiff was entitled to counseling by a licensed pharmacist. Navitus did not offer counseling under Occupations Code Section 562.003. Plaintiff was immediately eligible under two different manufacturer's programs to get Otezla for free. If she had been informed of that none of this would have happened.

93.    Plaintiff pursued an appeal of her denial of Otezla. She was not allowed to participate in the appeal. She received several calls from entities who said they were handling her appeal but she had no idea who they were or what they did.  She called and asked Community what was the published standard that was used to decide if she was entitled to Otezla but was told there was no standard, that there could be no standard, because every patient was different. Then at least two Community agents told her that the reason that Otezla was not approved is that Otezla was not covered. Community Agents told her to get another insurance plan that covered Otezla because Community did not. She went two months without Otezla when she switched plan and her fissures came back. Every time she stops the Otezla because of the byzantine rules of her new plan, that even the agents do not understand, her fissures return and Otezla is less effective.

They also return when she is stressed.

---

[85] Letter from Chief Compliance Officer Carolynn Jones, March 13, 2019.

Plaintiff's First Amended Complaint

Like today.

## **Relief Sought**

### **Monetary Damages**

Plaintiff asks:

That this Court find that Harris County is liable for Plaintiff's cab fare of $30.00 as it refused to provide her transportation home when she was released from her detention.

That this Court find that Plaintiff's personal injury damages are indivisible and that all Defendants are jointly and severally liable for:

1.     the injury to her right hand, wrist and arm, the pain she continues to suffer, and the diminution of her hand's fine motor skills in the amount of $50,000.00;

2.     her Pain and Mental anguish for the deprivation of her Civil Right in the amount of 100,000.00;

3.     the value of her lost time in investigating this matter in the amount of $50,000.00;

4,     $800 for a new iPhone and several phone repairs because for the first half a year after the detention she kept dropping everything whichever hand she used.

That this Court find that the insurance Defendants acted in bad faith and that they intentionally and maliciously inflicted emotional distress. After failing to inform her of her rights under the Step Therapy Protocol Exception, failing to let her know that that she could get the medicine for free, and for illusionary appeals and then refusing to give her access to the recordings of her call that she be awarded the amount $500,000.00 from each of them for her pain and suffering, loss of consortium, and mental anguish.

That this Court find that the Insurance Defendants acted in bad faith and with the purpose of hurting Plaintiff.

54

Plaintiff's First Amended Complaint

They forced her to disclose private information publicly by having to file suit to get the recording.

They removed this action to federal court where they falsely stated that she had been civilly committed and forced her to engage in litigation activities when she was repeatedly offering to dismiss the suit if she had made a suicide threat.

Then, instead of allowing her time to listen to the call and dismiss the suit, they filed their motion to dismiss attaching protected mental health information, including information that her son was a prosecutor, exposing him to extreme public contempt and ridicule leading to a loss of consortium.

Plaintiff Requests $1,000,000.00 dollars from each Insurance Defendant, and $2,000,000.00 from each of the Insurance Defendants' law firms of which she will donate one hundred per cent to an appropriate mental health or health care charity.

## Injunctive Relief Sought

Under Local Government Code Section 118.055 (c)–(d) and Health and Safety Code Section 571.018 the Harris County, the Harris County Hospital District dba Harris Health Systems, and The Harris Center for Mental Health and IDD only charge mental health detainees for involuntary services that are memorialized in a bill of costs prepared by the clerk of the probate court.

Under Health and Safety Code Sections 241.001(a)(1), 241.056(a), 321.003(a), and 611.005(a) that the Harris County Hospital District dba Harris Health Systems, and The Harris Center for Mental Health and IDD:

1.    Comply with legal mandate of Health and Safety Code Section 573.002(c) - (d) and 573.005(e) regarding requiring and retaining the Notice of Detention when accepting a detainee.

Plaintiff's First Amended Complaint

2.      Comply with legal standards of Health and Safety Code Section 573.002(d) and require a completed Notice of Detention as a predicate for temporary acceptance and examination of a non-consenting detainee;

3.      Comply with legal standards of Health and Safety Code Section 241.027(b)(4) and 42 CFR § 482.24 and maintain the medical records of detainees from the moment they are brought to the facility;

4.      Comply with legal standards of Health and Safety Code Sections 322.052, 576.024 and 42 CFR § 485.910(e) regarding the documentation and use of restraints;

5.      Comply with legal standards of Health and Safety Code Section 571.002(1), (3), and (7) and the Fifth and Fourteenth Amendments to the U.S. Constitution regarding the privacy rights of detainees and to allow no police officers to be involved in any way in the examination of detainees absent exigent circumstances;

6.      Comply with legal standards regarding the transport of detainees including returning released detainees to their residence or place of apprehension according to Health and Safety Code Sections 241.027(b), 573.024 and 573.024(a),(c);

7.      Comply with legal standards of Health and Safety Code Section 576.009 regarding the statutory Notice of Rights to be given to detainees;

8.      Comply with legal standards of Health and Safety Code Section 573.025 and the Sixth Amendment to the U.S. Constitution regarding honoring detainees' Right to Counsel prior to warrantless examinations;

9.      Comply with legal standards of Health and Safety Code Sections 571.002(4) and 571.012 regarding detainees' right to appear before a judge or magistrate prior to warrantless examination;

Plaintiff's First Amended Complaint

10. Comply with legal standards enunciated under the Fourth Amendment to the U.S. Constitution regarding the privacy of detainees preexisting medical records and to not search those records prior to and during the preliminary examination without judicial warrant, court order, or specific statutory justification;

11. Comply with legal standards enunciated under the Fourth Amendment to the U.S. Constitution and do no invasive testing, including the drawing of blood and taking of urine samples from detainees, without a judicial warrant, court order, or statutory mandate and explain to Detainees their right to refuse such testing;

12. Comply with legal standards enunciated under the Fourth Amendment to the U.S. Constitution and do no medical treatment of detainees in the absence of exigency, consent, judicial warrant, court order, or statutory mandate;

13. Comply with legal standards of Health and Safety Code Section 571.018 and Local Government Code Section 118.055 and seek reimbursement for the costs associated with Mental Health proceedings from Harris County and not detainees;

14. Comply with legal standards promulgated under 45 CFR Part 164 and Texas Health and Safety Code Section 576.005, Health and Safety Code Sections 611.004 and 611.0045 with regard to safeguarding detainees' private health care information.

Plaintiff seeks Injunctive Relief from the City of Houston that

1. HPD discontinue its policy of restraining all mental health detainees without cause;

2. HPD transport non-criminal detainees to a medical facility without restraints unless there is reasonable cause to restrain them and that all restraints of non-criminal detainees being transported to a medical facility conform to medically appropriate standards;

57

Plaintiff's First Amended Complaint

3.   HPD discontinue its policy to "err on the side of caution" when it detains individuals for emergency detention;

4.   HPD train its officers to distinguish between behavior caused by mental illness and behavior caused by medical conditions such as hypertensive crisis and blood sugar lows when it detains individuals for emergency detention;

5.   HPD never, in any policy or publicly disseminated document, categorize non-criminal mental health detainees as exactly the same as people adjudged to be violent and dangerous criminals.

Plaintiff prays for all this, and all costs and any such relief to which she may be legally and justly entitled.

## Certification

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted,

By: _____

Margaret Mitchell,  Pro Se

58

Plaintiff's First Amended Complaint

TBA 14217580
5927 Benning Drive
Houston, TX 77096
(281) 352-5286
iamanotherjanedoe@gmail.com
and mlrmitchell@sbcgloabal.net

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of December 2020, I hand filed the foregoing with the

Clerk of the court and a true and correct copy will be delivered to Navitus and Community as

Previously agreed by the parties and that the newly added defendants: The City of Houston,

Pat J. Daniel, Interim City Secretary at P.O. Box 1562, Houston, TX 77251; Defendant Harris

County Harris County Judge, the Honorable Lina Hidalgo, 1001 Preston Street, Suite 911,

Houston Texas, 77002; The Harris County Hospital District dba Harris Health System at 2525

Holly Hall, Houston Texas, 77054; Defendant The Harris Center for Mental Health and

IDD,D Wayne Young, its CEO, at 9401 Southwest Freeway, Houston Texas 77041, will be

sent copies of the petition by first class mail along with a request to waive service of process.

59

Plaintiff's First Amended Complaint